### Rene Alberto BELTRAN–ZAVALA, Petitioner,

v.

### IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

#### No. 89–70086.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1990.

Memorandum Filed June 5, 1990.

Order and Opinion Aug. 31, 1990.

---

Wynne S. Carvill, Elizabeth Thompson, and Theresa Helmer, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for petitioner.

Ellen Sue Shapiro, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Before BROWNING, NOONAN, and FERNANDEZ, Circuit Judges.

### ORDER

The memorandum disposition filed June 5, 1990 is redesignated as a per curiam opinion.

### OPINION

PER CURIAM:

Petitioner Rene Alberto Beltran–Zavala petitions for review of a decision of the Board of Immigration Appeals ("BIA"). The BIA decided that Beltran was ineligible for asylum, under Section 208(a) of the Immigration and Nationality Act ("INA") [8 U.S.C. § 1158(a)], and withholding of deportation, under Section 243(h) of the INA [8 U.S.C. § 1253(h)]. We grant the petition and remand the case to the BIA for determination of the withholding of deportation claim and for exercise of its discretion on the asylum claim.

## FACTS

Beltran is a citizen of El Salvador. He entered this country without inspection in June of 1981. While in this country, Beltran was arrested after selling $10 of marijuana to an undercover police officer. Beltran pleaded guilty to violating Cal. Health & Safety Code § 11360(a) (West Supp. 1990). He was sentenced to two years' probation.

In May 1987, Beltran was arrested for an alleged theft from an automobile. Beltran had his probation revoked. While imprisoned, Beltran received from the Immigration and Naturalization Service ("INS") an Order to Show Cause why he should not be deported. In response, Beltran applied for asylum.

In a declaration accompanying the application, Beltran alleged that, in October of 1980, he was a student in the city of San Miguel, El Salvador. He and a friend, Jilman Alberto Ulloa, attended an English class taught by a professor named Ramos. Ramos allegedly harassed the students. To stop the harassment, Ulloa, who was affiliated with anti-government guerrilla forces, called Ramos on the telephone. Ulloa threatened Ramos that if the harassment did not stop, the guerrillas would harm Ramos. Ulloa did not refer to Beltran during the telephone call.

Ramos then allegedly informed his brother of Ulloa's telephone call. Ramos' brother was a police department captain and had ties to Salvadoran security forces, known as the "death squads." Ramos allegedly told his brother that Ulloa and Beltran were guerrillas.

Soon after Ulloa's telephone call to Ramos, a jeep with a number of men arrived at Beltran's house. The men wore masks bearing the legend "E.M.," an abbreviation for "Esquadron de Muerte" (death squad). They first shot Ulloa, who was in front of the house. They then arrested Ulloa's girlfriend. The men next entered Beltran's house, where they arrested a friend of Beltran named Carlos Osmin Gomes. Osmin looked similar to Beltran and was mistaken for him. Beltran witnessed these events from a hidden position.

Afterwards, Ulloa's girlfriend was found in a field, naked and blindfolded. She had been raped repeatedly. Osmin's body was found in a bag. The condition of the body indicated that Osmin had been tortured. The bag bore the notation, "E.M.—traitor to the country."

Beltran then left for Berlin, in the department of Usulatan, to stay with his brother. Seven months later, he entered the United States.

Beltran alleges that the guerrillas killed Ramos, in retaliation for the October 1980 incident. As far as Beltran is aware, Ramos' brother is still alive.

An Immigration Judge ("IJ") conducted hearings on Beltran's application. At the conclusion of the hearings, the IJ rendered an oral decision. He held that Beltran did not qualify for withholding of deportation because he had been convicted of a "particularly serious crime." Section 243(h)(2)(B) of the INA [8 U.S.C. § 1253(h)(2)(B)]. The IJ found that a prima facie case for asylum had been established, but that the request should be denied on discretionary grounds. Beltran filed an appeal to the BIA.

The BIA dismissed the appeal. The BIA found that Beltran had not made a prima facie case for asylum. The BIA declared that, "We simply are not persuaded that the altercation between [Ulloa] and the professor was anything more than a strictly personal dispute between two people neither of whom was motivated by political concerns." The BIA affirmed the denial of withholding of deportation. We have jurisdiction under 8 U.S.C. § 1105a.

## DISCUSSION

 This court reviews decisions concerning asylum and withholding of deportation for substantial evidence. *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1282 nn. 8 & 9 (9th Cir.1984). Whether an offense is a particularly serious crime under Section 243(h)(2)(B) of the INA is reviewed de novo, but with deference to the INS' interpretation of that term in its regulations. *Ramirez–Ramos v. INS*, 814 F.2d 1394, 1396 (9th Cir.1987).

## I. *Asylum.*

■ An alien is eligible for asylum relief upon showing a well-founded fear of persecution. The well-founded fear standard is lower than the clear probability of persecution standard for withholding of deportation. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The well-founded fear standard has a subjective and objective component. The former is demonstrated by genuine fear and the latter by a "reasonable possibility" of persecution. *Hernandez–Ortiz v. INS,* 777 F.2d 509, 513 (9th Cir.1985). A well-founded fear may exist even when there is a one-in-ten possibility of persecution. *Arteaga v. INS,* 836 F.2d 1227, 1229 (9th Cir.1988) (citing *Cardoza–Fonseca,* 107 S.Ct. at 1213).

The IJ credited Beltran's testimony as to the events in El Salvador. The BIA did not disturb this credibility finding. Once credibility has been accorded to Beltran's testimony, corroborative evidence is not required. *Hernandez–Ortiz,* 777 F.2d at 514. This court can presume that Beltran was credible as to his persecution claims. *Maldonado–Cruz v. U.S. Dep't of Immigration and Naturalization,* 883 F.2d 788, 792 (9th Cir.1989).

■ The events to which Beltran testified show both a genuine fear and a reasonable possibility of persecution. Beltran is a target of persecution because the death squad episode directly resulted from Ulloa's telephone call. Beltran has established that a threat was made to a person who was able to summon the power of the death squad. Soon after the threat was made, the death squad arrived. The BIA does not dispute the inference that the death squad came on account of the telephone call. The death squad directed its violence at Ulloa and Ulloa's girlfriend. It also arrested someone resembling Beltran, tortured that person, and left a note with that person's body denouncing him as a traitor. No other person in Beltran's family was harmed, which suggests that the death squad was in search of persons identified by Ramos. The logical inference is not that Beltran was an unfortunate bystander; it is that he was a target of the violence. *See Hernandez–Ortiz,* 777 F.2d at 516.[1]

The INS' contentions in opposition are without merit. First, the INS argues that since Ramos is dead, Beltran has nothing to fear. The obvious answer is that Ramos' brother is still alive. There is little reason to think that the captain will look upon Beltran with more tolerance than he had before the professor was killed by people whom the captain considers Beltran's associates. Second, the INS alludes to Beltran's stay in El Salvador for seven months following the incident. Beltran, however, moved away from San Miguel to stay with his brother and remained there pending arrangements made by relatives in this country. This evidence shows that Beltran was attempting to evade the death squad. *See Rivas v. INS,* 899 F.2d 864, 871 (9th Cir.1990). Third, the INS suggests that Beltran can be deported to another part of El Salvador, citing *Quintanilla–Ticas v. INS,* 783 F.2d 955, 957 (9th Cir.1986). *Quintanilla–Ticas,* however, involved a threat by an individual. Here, a death squad awaits Beltran upon his return and apparently has the power to enforce its will. *See Lazo–Majano v. INS,* 813 F.2d 1432, 1435 (9th Cir.1987).

Not only is Beltran a target of persecution, but he is being persecuted on account of a political opinion. What is determinative here is not that Beltran holds a political opinion, but rather that the Salvadoran government or, at least, the uncontrollable death squad has imputed an opinion to Beltran and has persecuted him for that reason. Political persecution may be based on a political opinion imputed to the alien. *E.g., Desir v. Ilchert,* 840 F.2d 723, 728 (9th Cir.1988); *Lazo–Majano v. INS,* 813 F.2d at 1435. This court has extended asylum eligibility to those aliens who can show a

---

1. At oral argument, the INS contended that the death squad came only to shoot Ulloa and arrest Osmin. The INS made this contention even though the death squad came to Beltran's house to commit these acts soon after Ulloa's telephone call. The more logical inference from these events is that the death squad came in search of Beltran and Ulloa.

likelihood of political persecution based on abuses endured by family members and friends, even though the abuse has not yet reached the alien personally. *Rivas v. INS*, 899 F.2d 864 (9th Cir.1990).

■ Beltran presents an even more compelling case than *Rivas*, for he has shown that the death squad sought him because of a political opinion imputed to him. This inference is supported by the abuse suffered by Ulloa, his girlfriend, and Osmin. Osmin's body in addition bore the notation, "traitor to the country," which makes it clear that political opinion was the reason for Osmin's abduction and torture. There is a reasonable likelihood that Beltran will suffer political persecution upon return to El Salvador.

We, therefore, find that the INS erred when it determined that Beltran had not shown a well-founded fear of persecution. Beltran is eligible for asylum relief. The BIA should exercise its discretion whether to grant that relief under Section 208(a) of the INA [8 U.S.C. § 1158(a) ].[2]

II. *Withholding of Deportation.*

Section 243(h)(2)(B) [8 U.S.C. § 1253(h)(2)(B) ] precludes withholding of deportation relief for an alien who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." Under this provision it is the conviction that is in issue, not other acts that might render the alien dangerous to the community of the United States. *Ramirez–Ramos v. INS*, 814 F.2d 1394, 1397 (9th Cir.1987) ("[t]he participial phrase, 'having been convicted by a final judgment of a particularly serious crime,' modifies the word 'alien' and thus limits those aliens who may be determined to constitute a danger to the community to those who have been finally convicted of serious crimes").

■ The BIA found that Beltran was ineligible for withholding of deportation because he had been convicted of a "particu-

larly serious crime." The BIA cited our decision in *Mahini v. INS*, 779 F.2d 1419 (9th Cir.1986) and stated that:

[I]t is observed with approval that the Board has continually found convictions for drug possession and trafficking to be particularly serious and the offenders to be a danger to the community. While it is true, as the respondent has noted, that that case involved heroin and not marijuana, we are not persuaded that this is a meaningful distinction. The court accepted the Board's position that people who traffic in heroin are a danger to the community because of heroin's deleterious effect on people, and it is apparent that the laws of this country attribute deleterious effects to the use of marijuana as well.

The BIA did not explore the facts underlying Beltran's conviction. Rather, it, in effect, decided that Beltran's conviction supported a per se determination that he had committed a particularly serious crime.

In this case, Beltran was convicted of selling marijuana and was sentenced to the minimum base term of two years. Cal. Health & Safety Code § 11360(a) (West Supp.1990). California treats marijuana differently from other controlled substances and treats certain marijuana offenses as misdemeanors. *See* Cal.Health & Safety Code 11360(b) (West Supp.1990). Beltran was not convicted of the misdemeanor offense contained in Cal.Health & Safety Code § 11360(b). Instead, he was convicted of a felony and was sentenced to two years' probation. However, that is not the end of our inquiry.

The BIA set forth the standard for determining whether a particularly serious crime has been committed in *In re Frentescu*, 18 I. & N. Dec. 244 (1982):

While there are crimes which, on their face, are "particularly serious crimes" or clearly are not "particularly serious crimes," the record in most proceedings will have to be analyzed on a case-by-

---

**2.** We note that the IJ did exercise his discretion, and stated that asylum should be denied. That action is not before us, since we are reviewing the decision of the BIA itself. We cannot speculate about the result of the BIA's own exercise of discretion.

case basis. In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.

18 I. & N. Dec. at 247.

As far as we are aware, the BIA has not deviated from that formulation until now. We have approved the formulation. In *Mahini*, the defendant had been convicted of trafficking in heroin. We approved of the BIA's decision to deny withholding of deportation. As we stated, "In reaching its decision here, the Board considered several of the factors it set out in *Frentescu*: the nature of the conviction, the type of sentence imposed, and the circumstances and facts underlying the conviction." 779 F.2d at 1421.

In *Mahini*, we also observed that the decision was in accord with other sections of the INA. 8 U.S.C. § 1251(b). That provision ordinarily allows a court to recommend against deportation, but does not permit this relief for aliens convicted of narcotic drug offenses under 8 U.S.C. § 1251(a)(11). That is not to say, however, that 8 U.S.C. § 1253(h)(2)(B) erects classes of crimes that are per se particularly serious. If Congress wanted to erect per se classifications of crimes precluding immigration and nationality benefits, it knew how to do so. *See* 8 U.S.C. §§ 1182(a)(23), 1251(b). In contrast, the language of 8 U.S.C. § 1253(h)(2)(B), as interpreted in *Frentescu*, commits the BIA to an analysis of the characteristics and circumstances of the alien's conviction.

In the case at hand, however, the BIA did not examine the type of sentence or the underlying facts. It simply leapt directly from the fact of conviction to the determination that it could not withhold deportation. In fairness, it may not have given as

much consideration to this factor as it should have, because of its error regarding asylum. Had it been correct about Beltran's eligibility for asylum, the BIA could have concluded that Beltran was not entitled to withholding of deportation in any event. The BIA was not correct.

We accordingly vacate and remand the BIA's decision on withholding of deportation to apply the *Frentescu* factors to Beltran's case. If the BIA finds that Beltran's offense was not a particularly serious crime, the BIA should determine whether Beltran has demonstrated a clear probability of persecution to require withholding of deportation.[3] *See Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1284 (9th Cir.1984).

### III. *Attorney's Fees.*

Beltran's request for attorney's fees under 28 U.S.C. § 2412 is denied. A "final judgment" does not yet exist. *Papazian v. Bowen*, 856 F.2d 1455 (9th Cir.1988).

### CONCLUSION

The petition for review is GRANTED. We VACATE the BIA's determinations and REMAND this case to the BIA to exercise its discretion regarding asylum in light of our determination that Beltran has shown a well-founded fear of persecution. Moreover, the BIA should consider whether Beltran is entitled to withholding of deportation. In making that determination it must apply the factors described in *In re Frentescu*, 18 I. & N. Dec. 244 (1982) to Beltran's conviction. If it finds that a particularly serious crime does not exist, the BIA must also consider all of the other factors set forth in *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1284 (9th Cir.1984). Petitioner's application for attorney's fees is DENIED.

---

**3.** The presence of a particularly serious crime does not preclude a grant of asylum. The BIA has not yet exercised its discretion as to the asylum claim. The existence of a particularly serious crime would not preclude that exercise.

*See Castro–O'Ryan v. United States Dep't of Immigration and Naturalization*, 847 F.2d 1307 (9th Cir.1987). At most, it is a factor to be considered in the exercise of discretion. *See Castro–O'Ryan*, 847 F.2d at 1313.