**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIEGO MIGUEL-MIGUEL,
             *Petitioner-Appellant,*

v.

ALBERTO R. GONZALES, Attorney
General,
             *Respondent-Appellee.*

No. 05-15900

D.C. No.
CV-04-00759-JWS

OPINION

Appeal from the United States District Court
for the District of Arizona
John W. Sedwick, District Judge, Presiding

Argued and Submitted
July 13, 2007—San Francisco, California

Filed August 29, 2007

Before: Procter Hug, Jr., Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Robert B. Jobe (argued) and Fatma Marouf, San Francisco, California, for the petitioner-appellant.

Daniel G. Knauss, John Boyle and Cynthia M. Parsons (argued), Phoenix, Arizona, for the respondent-appellee.

**OPINION**

FISHER, Circuit Judge:

This case presents the question of whether the Attorney General may through an adjudicative decision create a strong presumption that a drug trafficking offense resulting in a sentence of less than five years is a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B). Diego Miguel-Miguel, a native of Guatemala, petitioned for withholding of removal based upon his alleged fear that his life or freedom would be threatened if he were returned to Guatemala. The Board of Immigration Appeals (BIA) agreed, declaring Miguel eligible for withholding of removal, but nonetheless ordered him removed because it found that Miguel's 1999 conviction for selling $20 of cocaine was a particularly serious crime. In so

finding, the BIA followed the presumption set forth in the Attorney General's opinion in *Matter of Y-L-*, 23 I. & N. Dec. 270 (Op. Att'y Gen. 2002), *disapproved of on other grounds by Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003), even though *Matter of Y-L-* was issued after Miguel had pled guilty to his 1999 offense. We hold that the Attorney General did have the authority to create his presumptive standard in *Y-L-*, but that the BIA erred by applying it retroactively to Miguel's case.

## BACKGROUND

Miguel was born in Guatemala and belongs to the indigenous Cakchiquel group. During the chaos of the country's civil war, Miguel's family was harassed by a guerilla group that believed that Miguel and his family supported the government. The guerillas initially demanded just money, but later threatened to kill Miguel if he did not join them. The guerillas took Miguel to the mountains, where they held him captive and forced him to serve as a lookout. During this time, Miguel witnessed the guerillas kill several people, and in one instance was forced to participate. Miguel says that he was afraid that if he did not assist the guerillas, they would kill him. After six months in captivity, Miguel was able to escape across the border into Mexico. He made his way to the United States, where he eventually applied for and was granted asylum in 1988.

In 1998, Miguel was charged in a California court for selling or transporting cocaine under California Health and Safety Code § 11352.[1] The facts of the offense are undisputed. While

---

[1] Section 11352 provides in relevant part:

> [E]very person who . . . sells . . . or offers to . . . sell [cocaine], unless upon the written prescription of a physician, dentist, podiatrist, or veterinarian licensed to practice in this state, shall be punished by imprisonment in the state prison for three, four, or five years.

he was standing on the street with a group of men, an under-cover agent approached Miguel and asked him for drugs. Miguel fetched .26 grams of rock cocaine from his associates and sold it to the agent for $20. Miguel pled guilty to the charges and received a sentence of time served (36 days), a fine of $200 and five years probation.

The Immigration & Naturalization Service (INS) placed Miguel in removal proceedings — triggering a series of hearings and appeals as the legal standards applied to Miguel's case evolved over the course of the proceedings. At the outset, Miguel admitted the allegations in the Notice to Appear and applied for withholding of removal. In October 1999, an Immigration Judge (IJ) found that Miguel's cocaine conviction did not preclude withholding of removal because the conviction was not for a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B), as that term had been defined by the BIA in *Matter of S-S-*, 22 I. & N. Dec. 458, 463-65 (BIA 1999) (en banc). The IJ nonetheless denied withholding of removal because, although Miguel had suffered past persecution, he had failed to provide documentary evidence that he continued to have a well-founded fear of future persecution. The BIA vacated the decision and remanded, however, since a new INS regulation had changed the standard for evaluating changed circumstances.

On remand the IJ in August 2001, again held that changed circumstances precluded withholding of removal. On appeal, the BIA held that the IJ had again applied the wrong standard governing changed circumstances. Applying the proper standard, the Board in March 2003 found that Miguel had demon-

---

Miguel was also convicted in 1998 of a drug possession offense under California Health & Safety Code § 11350(a). That offense, however, is not before us because Miguel's removal order is predicated only on his cocaine sale conviction. *See Lavira v. Attorney Gen. of United States*, 478 F.3d 158, 162 (3d Cir. 2007).

strated that his life or freedom would be threatened if he returned to Guatemala. Thus, Miguel was eligible for withholding of removal. Meanwhile, however, the government had moved to remand the case to the IJ because on March 5, 2002, while Miguel's appeal was pending, the Attorney General had issued his opinion in *Matter of Y-L-*. That opinion substantially altered the standard for determining whether a drug trafficking offense is "particularly serious" under § 1231(b)(3)(B). The BIA granted the motion to remand, sending the case back to the IJ to reconsider his prior determination that Miguel had not committed a particularly serious crime.

Applying the new standard, the IJ found that Miguel had indeed committed a particularly serious crime. The judge found that Miguel had failed to prove that his involvement in the cocaine transaction was "peripheral," and thus under *Matter of Y-L-*, Miguel's cocaine trafficking conviction was deemed particularly serious. The BIA affirmed without opinion.[2]

Miguel's habeas corpus petition filed in the United States District Court for the District of Arizona was denied. He then filed a timely appeal in this court. However, on May 11, 2005, the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231, went into effect, transforming Miguel's habeas appeal into a timely petition for review. *See Alvarez-Barajas v. Gonzales*, 418 F.3d 1050, 1053 (9th Cir. 2005).

## JURISDICTION

Before we reach the merits of Miguel's arguments, we must address the government's contention that we lack jurisdiction to do so. First, it argues that Miguel is a criminal alien under

---

[2]Because it is not before us, we take no position on whether the BIA's agreement with the IJ that Miguel's involvement in the underlying offense was not peripheral was correct.

8 U.S.C. § 1182(a)(2) and the BIA's determination that he committed a particularly serious crime under § 1231(b)(3)(B) is an unreviewable exercise of discretion. *See* 8 U.S.C. § 1252(a)(2)(B) & (C). Our jurisdiction is not foreclosed, however, insofar as Miguel's petition for review raises issues of law. *See* 8 U.S.C. § 1252(a)(2)(D). We hold that Miguel has done just that.

Miguel does not challenge the BIA's conclusion that his offense was particularly serious under *Matter of Y-L-*, but instead argues that the Attorney General lacked the authority to issue *Matter of Y-L-*, or that *Y-L-* is invalid as applied to this case. These are pure questions of law and therefore we have jurisdiction to review them. *See Afridi v. Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006) ("While we cannot reweigh evidence to determine if the crime was indeed particularly serious, we can determine whether the BIA applied the correct legal standard in making its determination.").

Second, the government argues that we lack jurisdiction because Miguel did not exhaust his argument that the BIA erred in failing to heed *Beltran-Zavala v. INS*, 912 F.2d 1027 (9th Cir. 1990) (per curiam), which prohibits the BIA from holding that a particular crime is *per se* particularly serious under § 1231(b)(3)(B). *See* 8 U.S.C. § 1252(d)(1); *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004). But Miguel did raise this argument during his penultimate trip to the BIA, when he argued that no remand to the IJ was necessary because *Y-L-* conflicted with *Beltran-Zavala*. The BIA implicitly rejected this argument in its March 2003 decision, holding that the case should be remanded for the IJ to make findings under *Y-L-*. Although Miguel did not re-raise the argument on remand to the IJ, or in his final appeal to the BIA, there is no requirement that immigration petitioners exhaust an argument before the BIA more than once, particularly where as here the BIA has already rejected the argument. *See Ladha v. INS*, 215 F.3d 889, 903 (9th Cir. 2000) (holding that exhaustion is satisfied where the BIA "had a full opportunity to resolve [the]

controversy or correct its own errors before judicial intervention" (citation and quotation marks omitted, alteration in original)).

Accordingly, we turn to the merits of Miguel's appeal.

## DISCUSSION

### I

Miguel makes a facial challenge to *Matter of Y-L-*, relying upon two premises. First, he asserts that *Matter of Y-L-* created what amounts to a per se rule that turns all drug trafficking offenses into particularly serious crimes under § 1231(b). Second, he contends that the Attorney General was forbidden from promulgating such a per se rule by Ninth Circuit law, the statute's plain text, the Administrative Procedure Act (APA) and the Constitution. We reject Miguel's first premise because *Y-L-* on its face purports to create only a strong presumption, not a per se rule. We thus need not decide whether the Attorney General can create per se rules under § 1231(b). Instead, we hold only that the Attorney General did not exceed his powers by creating the strong presumption set forth in *Y-L-*.

### A

Consistent with the United States' treaty obligations under the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (1968), Congress has provided that an alien may not be removed to a nation in which his or her life or freedom would be threatened on a protected ground unless "the Attorney General decides that . . . the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community." 8 U.S.C. § 1231(b)(3)(B)(ii). The degree to which Congress has defined "particularly serious crime," rather than leaving it for the Attorney General to define, has changed over time.

Before 1990, the Immigration and Nationality Act (INA) did not define the term at all. *See* 8 U.S.C. § 1253(h)(2)(B) (1990). Rather, the definition of the term was developed by the BIA through adjudication. In *Matter of Frentescu*, 18 I. & N. Dec. 244 (BIA 1982), the BIA articulated a multi-factor test for determining whether a particular crime was particularly serious. The factors included "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Id.* at 244. We approved of the *Frentescu* factors in *Mahini v. INS*, 779 F.2d 1419 (9th Cir. 1986), holding that the Board had properly concluded that an alien convicted of heroin trafficking who received a sentence of 13 months imprisonment had committed a particularly serious crime. *Id.* at 1421. We reaffirmed and extended *Mahini* in 1990 in *Beltran-Zavala,* holding that the application of *Frentescu*'s case-by-case analysis was mandatory and that the BIA could not erect classes of crimes that were particularly serious per se. *See Beltran-Zavala*, 912 F.2d at 1031-32.

That same year, however, Congress amended the INA to provide that *all* aggravated felonies were particularly serious crimes. *See* Immigration Act of 1990, Pub. L. 101-649, § 515, 104 Stat. 4978, 5053 (Nov. 29, 1990); 8 U.S.C. § 1253(h) (1991). This amendment overruled *Frentescu* and *Beltran-Zavala* by precluding case-by-case analysis for any aggravated felony. Then, in 1996, Congress again amended the INA's definition of particularly serious crime. Congress eliminated the categorical rule, replacing it with a presumption that aggravated felonies are particularly serious. The presumption could be rebutted if the Attorney General determined it "necessary to ensure compliance with the 1976 United Nations Protocol Relating to the Status of Refugees." *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 413(f), 110 Stat. 1214, 1269 (Apr. 24, 1996); 8 U.S.C. § 1253(h)(3)(B) (1996).

Just a few months later, however, Congress yet again amended the statute. Those amendments, which remain in effect today, eliminated the presumption and replaced it with a two-tiered approach. First, Congress made aggravated felonies for which the alien receives a sentence of imprisonment of five years or more particularly serious per se. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, div. C, sec. 305, § 241, 110 Stat. 3009, 3009-602 (Sept. 30, 1996); 8 U.S.C. § 1231(b)(3)(B) (1997).[3] Second, however, the statute specifically provides that the creation of this class of per se particularly serious crimes "shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." *Id.* In two en banc decisions, the BIA held that IIRIRA revived the *Frentescu* mode of case-by-case analysis for aggravated felony convictions resulting in sentences less than five years. *See Matter of L-S*, 22 I. & N. Dec. 645, 649 (BIA 1999) (en banc); *Matter of S-S-*, 22 I. & N. Dec. at 463-65. We agreed with that conclusion in *Afridi v. Gonzales*, 442 F.3d 1212, 1220-21 & n.4 (9th Cir. 2006). *Afridi*, however, involved a sexual abuse offense, and thus did not consider the validity of *Matter of Y-L-*.

---

[3]The current text provides that an alien may be deported, notwithstanding a threat to his life or freedom, if "the Attorney General decides that . . . the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii) (2007). The statute further provides:

> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1213(b)(3)(B) (2007).

**[1]** The Attorney General's 2002 opinion in *Y-L-* instructs the BIA to treat all drug trafficking offenses presumptively as "particularly serious crimes." This presumption can be rebutted only in the "extraordinary," "extenuating" and "compelling" case where a petitioner can demonstrate "at a *minimum*":

(1)   a very small quantity of controlled substance;

(2)   a very modest amount of money paid for the drugs in the offending transaction;

(3)   merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy;

(4)   the absence of any violence or threat of violence, implicit or otherwise, associated with the offense;

(5)   the absence of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and

(6)   the absence of any adverse or harmful effect of the activity or transaction on juveniles.

*Matter of Y-L-*, 23 I. & N. Dec. at 274, 276-77 (emphasis in original). In addition, "[o]nly if *all* of these criteria were demonstrated by an alien would it be appropriate to consider whether other, more unusual circumstances . . . might justify departure from" the presumption. *Id.* at 277 (emphasis in original). Thus *Matter of Y-L-* creates an extraordinarily strong presumption that drug trafficking offenses are particularly serious crimes. It therefore purports to overrule *Matter of L-S-*, *Matter of S-S-* and *Frentescu* in part by precluding application of the *Frentescu* factors in most drug trafficking cases.

**[2]** The Attorney General in *Y-L-* purported *not* to be creating a per se rule. *See Matter of Y-L-*, 23 I. & N. Dec. at 276 (stating that "I do not consider it necessary . . . to exclude entirely the possibility of the very rare case where an alien may be able to demonstrate extraordinary and compelling circumstances that justify treating a particular drug trafficking crime as falling short of" being a particularly serious crime). Presumably *Y-L-* will be interpreted consistent with this statement and there will be some cases in which its exception applies. *See, e.g.*, *Lavira*, 478 F.3d at 165 (stating that the petitioner appeared to be "squarely within the exception carved out by" *Y-L-*). Thus, *Y-L-* creates a strong presumption, not a per se rule.

## B

**[3]** Neither our precedent nor the text of § 1231(b)(3) precluded the Attorney General from issuing *Matter of Y-L-*. In *Beltran-Zavala*, we made application of the *Frentescu* factors mandatory for two reasons. First, the BIA had consistently applied *Frentescu* and thus was bound by its own precedent to continue applying that analytical framework. *See Beltran-Zavala*, 912 F.2d at 1032. This reasoning does not apply here because the Attorney General may overrule the BIA by issuing a published opinion. *See* 8 C.F.R. § 103.37(g); 8 C.F.R. § 1003.1(g); BIA Practice Manual § 1.4(g) (2004).

Second, *Beltran-Zavala* held that the structure of the statute precluded creation of per se particularly serious crimes because "[i]f Congress wanted to erect per se classifications of crimes precluding immigration and nationality benefits, it knew how to do so." 912 F.2d at 1032 (citations omitted). This reasoning is no longer directly applicable because the text and structure of the statute have changed. The statute now does include a class of per se particularly serious crimes: those aggravated felonies for which aliens have received sentences of five years or more. 8 U.S.C. § 1231(b)(3)(B). Nor is the statute silent with regard to other crimes: it specifically

grants the Attorney General the authority to "determin[e] that
. . . an alien has been convicted of a particularly serious
crime." *Id.* In *Y-L-* the Attorney General interpreted this pro-
vision to permit the creation of a strong presumption that drug
trafficking offenses are particularly serious. *See Matter of Y-
L-*, 23 I. & N. Dec. at 274, 276. We are to afford the Attorney
General's interpretation deference under *Chevron U.S.A. Inc.
v. Natural Resources Defense Council, Inc.*, 467 U.S. 837
(1984). *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999).
We must therefore ask whether the statute is "silent or ambig-
uous" with respect to the Attorney General's authority to
create strong presumptions of the sort set forth in *Y-L-*. *Id.*
(citation omitted). If it is, we must then ask whether the Attor-
ney General's interpretation "is based on a permissible con-
struction of the statute." *Id.* (citation omitted).

Miguel argues that the plain text of the statute requires a
*Frentescu* case-by-case analysis because it allows removal
based on prior criminal conduct only where the Attorney Gen-
eral "determin[es] that . . . *an alien* has been convicted of a
particularly serious crime." 8 U.S.C. § 1231(b)(3)(B) (empha-
sis added). Miguel interprets the reference to "an alien" rather
than "a crime" to limit the scope of the Attorney General's
discretion to making determinations with regard to particular
aliens on a case-by-case basis, not to designating per se
crimes. This argument is misplaced because *Matter of Y-L-*
does not purport to create a per se rule; and the statute's text
does not plainly foreclose the Attorney General's creation of
strong presumptions. Miguel's interpretation of the statute,
though plausible, is not the only permissible construction. The
sentence immediately preceding the sentence Miguel relies
upon also refers to "an alien" even though that sentence
undisputedly establishes a per se class of particularly serious
crimes. *See* 8 U.S.C. § 1231(b)(3)(B) (providing that "*an
alien* who has been convicted of an aggravated felony (or fel-
onies) for which *the alien* has been sentenced to an aggregate
term of imprisonment of at least 5 years shall be considered
to have committed a particularly serious crime" (emphasis

added)). It is not clear that Congress would refer to "an alien" in one sentence to describe a per se rule that permits no case-by-case analysis but in the next sentence use "an alien" in order to specifically preclude the creation of a strong presumption that merely restricts the scope of case-by-case analysis. Thus § 1231(b)(3)(B) is ambiguous as to whether Congress meant to limit the Attorney General's ability to create strong presumptions.

[4] Because the statute's text is not plain in either precluding or permitting the Attorney General to create strong presumptions, we must ask whether the Attorney General's interpretation is impermissible. *See Aguirre-Aguirre*, 526 U.S. at 424. It is not. As explained above, the statutory text itself can plausibly be understood as providing the Attorney General discretion to create strong presumptions. *See Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc) (holding that at *Chevron* step two, the court asks "whether the agency's interpretation reflects a plausible reading of the statutory text"). The legislative history also supports the Attorney General's interpretation, as it states that "the Attorney General retains the authority to determine *other circumstances* in which an alien has been convicted of a particularly serious crime." H.R. Conf. Rep. No. 104-828, at 216 (1996) (emphasis added).

[5] Miguel contends that the Attorney General's interpretation is impermissible because it conflicts with the United Nations High Commissioner for Refugees Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1992) ("UNHCR Handbook"). The Handbook states that refugees may be returned to countries in which they face persecution only in "extreme cases," and suggests that a "serious" crime must be "a capital crime or a very grave punishable act." UNHCR Handbook, *supra*, at ¶ 154-55.[4] Admittedly, the

---

[4]The Handbook does not directly define particularly serious crime, but does comment on the meaning of "serious" in the context of defining the term "serious non-political crime" in Article 1F(b) of the 1951 United Nations Convention Relating to the Status of Refugees. *See Frentescu*, 18 I. & N. Dec. at 245-47.

creation of a strong presumption that all drug trafficking offenses — even relatively minor ones — are particularly serious is in tension with the Handbook's definition. We view the UNHCR Handbook as "persuasive authority in interpreting the scope of refugee status under domestic asylum law." *Ndom v. Ashcroft*, 384 F.3d 743, 753 n.4 (9th Cir. 2004); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987) ("[T]he Handbook provides significant guidance in construing the Protocol, to which Congress sought to conform."). But the Handbook "is not binding on the Attorney General, the BIA, or United States courts." *Aguirre-Aguirre*, 526 U.S. at 427. If the Attorney General's interpretation is permissible in light of the statute's text, structure and purpose, we must defer under *Chevron* to the Attorney General's interpretation even if it is in tension with the UNHCR Handbook. *See id.*

[6] We hold that the Attorney General's construction of § 1231(b)(3)(B) as providing him with discretion to create a strong presumption that drug trafficking offenses are particularly serious crimes is not impermissible. Under *Chevron*, we therefore defer to that construction. Accordingly, after *Matter of Y-L-*, a *Frentescu* analysis is no longer required with regard to drug trafficking offenses.[5]

## C

[7] Miguel next argues that even if the Attorney General's interpretation is permissible in light of the statutory text, it

---

[5]Insofar as Miguel also argues that *Matter of Y-L-*'s ultimate conclusion — that most drug trafficking offenses are particularly serious — is impermissible, we reject that argument. The Attorney General justified the *Y-L-* presumption based upon the BIA's prior treatment of drug trafficking offenses as "*inherently* . . . particularly serious," Congress' imposition of harsh punishment for such offenses and the threats to public safety posed by drug use and the illegal drug trade. *See* 23 I. & N. Dec. at 274-76 (quoting *Matter of U-M-*, 20 I. & M. Dec. 327, 330-31 (BIA 1991)). The Attorney General's choice to so exercise his discretion was not impermissible in light of the statute's text, structure or purpose.

nonetheless violates the Fifth Amendment Due Process Clause by creating a de facto per se rule. Miguel relies upon *Chong v. INS*, 264 F.3d 378 (3d Cir. 2001), which suggested that due process requires an "individualized determination" with regard to whether an alien has committed a particularly serious crime and that it would be problematic for an IJ to "blindly follow[ ] a categorical rule, i.e. that all drug convictions qualify as 'particularly serious crimes.' " *Id.* at 387 (citation omitted); *see also Matter of Y-L-*, 23 I. & N. Dec. at 276 n.12 (stating that *Chong* "indicate[s] that the application of 'per se' determinations is legally questionable"). Once again, Miguel's challenge misses the mark, because we do not read *Matter of Y-L-* as creating a per se rule. Moreover, *Chong* concerned only an alien's procedural due process right to engage in "factfinding based on a record produced before the Board and disclosed to her." *Chong*, 264 F.3d at 386. *Chong* did not hold that aliens have a substantive due process right that precludes Congress or the Attorney General from crafting particular legal standards in a particular manner. If such a substantive due process right existed, it would mean that Congress violated the Constitution by categorizing all aggravated felonies as particularly serious crimes from 1990 to 1996, or that it is violating the Constitution now by making all aggravating felonies with more than a five year sentence per se particularly serious. There is no support for such a constitutional rule.

**[8]** Miguel does not claim his procedural due process rights were violated, and even if he had we would reject that claim. Miguel received all the process to which he was due, i.e. "a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." *Ladha v. INS*, 215 F.3d 889, 904 (9th Cir. 2000) (citation omitted). Although *Matter of Y-L-* made it much more difficult as a substantive matter for Miguel to avoid removal, we cannot say the procedures he received — which included full briefing and a hearing before the IJ — were "so fundamentally unfair that [he]

was prevented from reasonably presenting his case." *Id.* (citation omitted).

**D**

**[9]** Miguel next argues that *Matter of Y-L-* sets forth an unconstitutionally vague rule. However, constitutional vagueness requirements apply only to "vague statutory language" or to "unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001). Neither circumstance is present here. *Matter of Y-L-* is not a statute or regulation, but instead an adjudicatory interpretation of statutory text. Nor does *Y-L-* expand the statutory language. To the contrary, *Y-L-* brings a measure of precision to § 1231(b)(3)(B)'s somewhat vague text, which Miguel does not challenge as itself unconstitutionally vague. Miguel's vagueness challenge therefore fails.

**E**

**[10]** Miguel also argues that *Matter of Y-L-* is invalid because it is a legislative rule under the APA and therefore the Attorney General could not issue it without first engaging in notice-and-comment rulemaking procedures. *See Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). The government responds that *Matter of Y-L-* is an interpretive rule and so those procedures are not required. *See id.*; 5 U.S.C. § 553(b). Both sides miss the point that *Matter of Y-L-* is an *adjudicative decision* and thus does not fit within the legislative/interpretive framework for rulemaking. *See Cent. Tex. Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 210-11 (D.C. Cir. 2005). Generally, an agency "is not precluded from announcing new principles in an adjudicative proceeding and . . . the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *see also Yang v. INS*, 79 F.3d 932, 936 (9th Cir. 1996). Of course, in certain

circumstances an agency may abuse its discretion by announcing new rules through adjudication rather than through rulemaking, such as when the rule operates retroactively and disturbs settled expectations. *See Pfaff v. U.S. Dep't of Hous. and Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996); *Patel v. INS*, 638 F.2d 1199, 1203-05 (9th Cir. 1980); *Ruangswang v. INS*, 591 F.2d 39, 44 (9th Cir. 1978). We consider the retroactivity question next.

## II

Miguel argues that even if *Matter of Y-L-* is valid on its face, the BIA nonetheless is barred from applying it retroactively to his case by *Montgomery Ward & Co., Inc. v. FTC*, 691 F.2d 1322 (9th Cir. 1982). When Miguel pled guilty in 1999 to selling a small amount of cocaine for $20 and was sentenced to time served (36 days), the immigration consequences of doing so were unambiguously governed by *Frentescu*. Indeed, applying that standard, the IJ found that Miguel had *not* committed a particularly serious crime. It was only later, when the Attorney General issued *Matter of Y-L-* and the BIA remanded Miguel's case for reconsideration under that standard, that the consequences of Miguel's prior conduct and plea were adversely enhanced. We agree that the BIA applied *Matter of Y-L-* retroactively to Miguel, and that it was forbidden from doing so by *Montgomery Ward*.

**[11]** In *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947), the Supreme Court held that an agency may give retroactive force to a new rule created through adjudicatory action, but "[the] retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *See also Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 60 n.12 (1984) (recognizing the principle that "an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests"). The D.C. Circuit in *Retail, Wholesale and Department Store*

*Union, AFL-CIO v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972), fleshed out this balancing test by identifying five non-exhaustive factors for determining when an agency's retroactive application of an adjudicatory decision is invalid:

> (1)  whether the particular case is one of first impression,
>
> (2)  whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law,
>
> (3)  the extent to which the party against whom the new rule is applied relied on the former rule,
>
> (4)  the degree of the burden which a retroactive order imposes on a party, and
>
> (5)  the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* at 390. We adopted the *Retail, Wholesale* factors in *Montgomery Ward*, 691 F.2d at 1333. These factors are meant to "balance[ ] a regulated party's interest in being able to rely on the terms of a rule as it is written against an agency's interest in retroactive application of an adjudicatory decision." *Chang v. United States*, 327 F.3d 911, 928 (9th Cir. 2003). We must therefore apply the factors here to determine whether the BIA erred by retroactively applying *Matter of Y-L-* to Miguel's case.

**[12]** To begin, this is not a case of first impression. Before *Matter of Y-L-*, both the BIA and this court had affirmed *Frentescu*'s case-by-case mode of analyzing whether a particular alien had committed a particularly serious crime, including drug trafficking offenses. *See Beltran-Zavala*, 912 F.2d at 1031-32; *Mahini*, 779 F.2d at 1421; *Matter of L-S*, 22 I. & N. Dec. at 649; *Matter of S-S-*, 22 I. & N. Dec. at 463-65. More-

over, the first factor is directed towards maintaining an incentive for litigants to raise novel claims by allowing a litigant who successfully argues for a new rule to get the benefit of that rule. *See Retail, Wholesale*, 466 F.2d at 390. It also ensures that agencies do not issue advisory opinions. *See id.* Neither of these concerns is in play here because the Attorney General did not announce its new rule in this case; instead the BIA seeks to apply the new rule announced in *Y-L-* to an unrelated proceeding. The first factor thus favors Miguel. *See id.* at 391 (stating that retroactivity is disfavored "where the [agency] ha[s] confronted the problem before, ha[s] established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted").

[13] The second factor also favors Miguel. That factor "requires the court to gauge the unexpectedness of a rule and the extent to which the new principle serves the important but workaday function of filling in the interstices of the law." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1082 (D.C. Cir. 1987) (en banc). "It implicitly recognizes that the longer and more consistently an agency has followed one view of the law, the more likely it is that private parties have reasonably relied to their detriment on that view." *Id.* at 1082-83. Before *Matter of Y-L-*, aliens convicted of drug trafficking offenses resulting in sentences of less than five years could expect that the BIA would make a particularly serious crime determination based on the individual circumstances of their cases. After *Y-L-*, aliens in the same position can expect that any drug trafficking conviction will almost certainly result in removal. The significance of the difference in standards before and after *Y-L-* is illustrated by this case, in which the IJ concluded under *Frentescu* that Miguel had not committed a particularly serious crime but reached exactly the opposite conclusion when applying *Y-L-*. *Cf. Chang*, 327 F.3d at 928 (relying on inconsistent determinations with regard to the alien plaintiffs before and after the

new rule was announced to conclude that the rule change was an "abrupt departure").

**[14]** The third factor also favors Miguel. "There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." *INS v. St. Cyr*, 533 U.S. 289, 322 (2001). When Miguel pled guilty in 1999 he had a realistic chance that the BIA, applying *Frentescu*, would find that the crime was not particularly serious and the IJ did so find. The application of *Y-L-* changes the game entirely. Given the exceedingly strong presumption contained in *Y-L-* and the strong likelihood that the BIA would not deem Miguel's participation "peripheral," *Y-L-* made it a near (if not total) certainty that Miguel's decision to plead guilty would result in his removal. *See id.* at 325 ("There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation."); *see also Kankamalage v. INS*, 335 F.3d 858, 862-63 (9th Cir. 2003).

**[15]** The fourth factor strongly favors Miguel. We have previously held that deportation alone is a substantial burden that weighs against retroactive application of an agency adjudication. *See Ruangswang*, 591 F.2d at 44. Here the burden is much greater. Miguel testified that his life would be threatened if he returned to Guatemala. The BIA agreed that Miguel faced future persecution. Although these threats may have lessened with the passage of time, we nonetheless conclude that the seriousness of the harms that could befall Miguel if he were removed to Guatemala weigh strongly against retroactive application of *Y-L-* to his case.

**[16]** Only the final factor favors the government. By amending section § 1231(b)(3)(B), Congress gave the Attorney General substantial discretion with regard to particularly serious crime determinations. In *Y-L-*, the Attorney General singled out narcotics trafficking as particularly serious, both

in the interest of public safety and in bringing uniformity to the law. *See Matter of Y-L-*, 23 I. & N. Dec. at 273 (stating that *Frentescu* regime "has led to results that are both inconsistent and . . . illogical"). But these interests are substantially served by prospective application of *Matter of Y-L-*. Forbidding the Attorney General from applying *Y-L-* retroactively in this case therefore does not severely limit his efforts to pursue the statutory mandate.

**[17]** Accordingly, because the *Montgomery Ward* analysis tilts decidedly in Miguel's favor, we hold that retroactive application of the *Matter of Y-L-* test to his case was impermissible.[6]

## CONCLUSION

For the foregoing reasons, we grant the petition for review and remand to the BIA for further proceedings.

**PETITION GRANTED; REMANDED.**

---

[6]The government contends that even if the BIA erred by applying *Y-L-* retroactively, we need not remand because the BIA held that Miguel failed to demonstrate future persecution justifying withholding of removal. This flatly misrepresents the record: the BIA specifically held that Miguel had demonstrated past persecution and that the government failed to rebut the presumption that he would be persecuted in the future. Thus, the Board held, petitioner "demonstrated his eligibility for withholding of removal under the Act," aside from the issues involving *Y-L-*.