Opinion by Judge BYBEE;
Concurrence by Chief Judge KOZINSKI; Concurrence by Judge GOULD; Partial Concurrence and Partial Dissent by Judge GRABER; Dissent by Judge REINHARDT; Dissent by Judge PAEZ.
OPINION
BYBEE, Circuit Judge:
In National Cable & Telecommunications Ass’n v. Brand X Internet Services, the Supreme Court instructed federal courts to defer to reasonable agency interpretations of ambiguous statutes, even when those interpretations conflict with the prior holding of a federal circuit court. 545 U.S. 967, 982-83, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). That is the situation we confront here. In Acosta v. Gonzales, 439 F.3d 550, 553-56 (9th Cir.2006), we held that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) of the Immigration and Nationality Act (“INA”), 8 U.S.C. § 1182(a)(9)(C)(i)(I), are eligible for adjustment of status under INA § 245(i), 8 U.S.C. § 1255(i), in spite of the latter section’s requirement of admissibility. A year later, the Board of Immigration Appeals (“BIA”) decided that such aliens are not eligible to apply for adjustment of status under § 245(i) in In re Briones, 24 I. & N. Dec. 355, 371 (BIA 2007). In this case, we must decide whether to defer to the agency’s interpretation of the INA and overrule Acosta and, if so, whether the agency’s interpretation may be applied to Garfias retroactively.
We conclude that we must defer to the BIA’s decision, and we hold that the BIA’s decision may be applied retroactively to Garfias. We thus deny his petition for review.
I. FACTS AND PROCEDURAL HISTORY
Francisco Javier Garfias-Rodriguez (“Garfias”) is a native and citizen of Mexico. He unlawfully entered the United States in 1996 and briefly departed twice, first to visit his ailing mother in 1999 and then to attend her funeral in 2001. He reentered the United States without permission both times. In April 2001, Garfias’s then-current employer filed an application for labor certification with the Oregon Employment Department on his behalf but later withdrew the application after he ceased working for that employer. Garfias married his wife Nancy, a United States citizen, in April 2002. He applied to adjust his status to that of a lawful permanent resident in June of 2002, paying a total of $1305 in fees. In 2004, United States Citizenship and Immigration Services issued Garfias a Notice to Appear (“NTA”) charging him with removability under INA § 212(a)(6)(A)®, as “[a]n alien present in the United States without being admitted or paroled,” and § 212(a)(9)(C)®, as an alien who has been “unlawfully present *508 in the United States for an aggregate period” of more than one year and reentered without permission.
In proceedings before an immigration judge (“IJ”), Garfias conceded removability on both grounds charged in the NTA. He requested relief in the form of adjustment of status and, in the alternative, voluntary departure. In July 2004, the IJ denied Garfias’s application for status adjustment, holding that Garfias was inadmissible under INA § 212 and thus ineligible for adjustment under § 245(i). In a per curiam decision in March 2006, the BIA sustained Garfias’s appeal. The BIA noted that “the Ninth Circuit, in whose jurisdiction this proceeding arises, held that an alien inadmissible under section 212(a)(9)(C)(i) of the Act could apply for adjustment of status under section 245(i) in conjunction with a request that the Attorney General retroactively consent to his reapplying for admission,” and remanded the case to the IJ for reconsideration in light of those decisions. See Acosta, 439 F.3d at 556; Perez-Gonzalez v. Ashcroft, 379 F.3d 783 (9th Cir.2004).
On remand, Garfias renewed his application for adjustment of status, but in November 2007 the IJ once again denied the request for adjustment. The IJ found that Garfias could not establish that his application was filed before § 245(i)’s expiration date of April 30, 2001.[1] The IJ reasoned that Garfias’s application based on his marriage to a U.S. citizen was filed after April 30, 2001, and he was not grandfathered in by his application for a labor certification because there was no proof the labor certification was “properly filed.” Garfias again appealed to the BIA.
The BIA dismissed his appeal in July 2009. It did not rule on the IJ’s grounds for denying the application. Instead, the BIA noted that subsequent to the IJ’s decision, it had issued In re Briones, 24 I. & N. Dec. at 371, which held that an alien could not seek status adjustment under § 245(i) if he was ineligible for admission under § 212(a)(9)(C)(i)(I). The BIA then explained that since this court had abrogated Perez-Gonzalez under a Brand X theory, see Duran Gonzales v. Dep’t of Homeland Sec. (Duran Gonzales I), 508 F.3d 1227, 1241-42 (9th Cir.2007), the BIA could now apply the Briones rule to cases arising in the Ninth Circuit. It therefore dismissed the appeal, granted Garfias sixty days to voluntarily depart, ordered removal in the event that he failed to depart, and informed him that filing a petition for review would automatically terminate the grant of voluntary departure.
Garfias filed a petition for review with this court. He raised three arguments: (1) that Briones is not entitled to Chevron[2] deference, (2) that Briones should not be applied to his case retroactively, and (3) that 8 C.F.R. § 1240.26(i), which terminates any grant of voluntary departure upon the filing of a petition for judicial review of a removal order, is an invalid exercise of statutorily delegated power. A panel of this court rejected his claims and *509 denied the petition for review. Garfias-Rodriguez v. Holder, 649 F.3d 942, 953 (9th Cir.2011). We granted Garfias’s petition for rehearing en banc. Garfias-Rodriguez v. Holder, 672 F.3d 1125 (9th Cir. 2012).
II. LEGAL BACKGROUND
A. The Tension Between INA § 212(a)(9)(C) and § 2I5(i)
Congress enacted § 245(i) in 1994 to provide an avenue for “aliens who entered without inspection but who have access to a visa (typically an immigrant spouse of a citizen) to legalize their status without leaving the country and incurring a long and needless separation from their family.” Ramirez-Canales v. Mukasey, 517 F.3d 904, 907-08 (6th Cir.2008); see also Briones, 24 I. & N. Dec. at 359-60. However, the Attorney General is permitted to adjust an applicant’s status under this section only if “the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.” 8 U.S.C. § 1255(i)(2)(A).
When § 245(i) was first enacted, aliens present in the United States who had entered without inspection were considered “deportable” aliens under former § 241(a)(1)(B) of the INA. See Briones, 24 I. & N. Dec. at 362-63 (citing 8 U.S.C. § 1251(a)(1)(B) (1994)). Thus, that provision did not implicate § 245(i)’s requirement that the alien be “admissible” to the United States. However, in 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (“IIRIRA”), which “recharacterized” as “inadmissible” aliens who had previously been labeled “deportable” for entering the country without inspection. Briones, 24 I. & N. Dec. at 363. As a result, § 212 currently renders inadmissible “[a]ny alien who ... has been unlawfully present in the United States for an aggregate period of more than 1 year, ... and who enters or attempts to reenter the United States without being admitted.” 8 U.S.C. § 1182(a)(9)(C)(i)(I). IIRIRA did not, however, address the effect of this change on the status adjustment provision of § 245(i).
In short, although § 245(i) ostensibly provides an avenue for aliens eligible to receive a visa but living illegally in the United States to adjust their status to that of a lawful permanent resident, requirement of “admissibility” seems to vitiate that purpose for some illegal aliens in light of the subsequent enactment of § 212(a)(9)(C). Congress has not explained how to handle an alien who is inadmissible under § 212(a)(9)(C)(i)(I) but otherwise qualified for adjustment of status under § 245(i).[3]
B. The Ninth Circuit and the BIA Address the Tension
1. The Parting of the Ways
In Perez-Gonzalez, we held that the inadmissibility provision of INA § 212(a)(9)(C)(i)(II)[4] did not preclude status adjustment under § 245(i). 379 *510 F.3d at 792-95. We declined to defer to a guidance memorandum issued by the Immigration and Naturalization Service (“INS”), which concluded that status adjustment was unavailable to aliens inadmissible under § 212(a)(9)(C)(i)(II), because interpretations in the “informal format[ ]” of a guidance memorandum are not entitled “to the rigorous deference owed formal agency interpretations under Chevron.” Id. at 792-93. Applying a less deferential form of review, we found that the memorandum’s interpretation conflicted with “[t]he regulations at 8 C.F.R. § 212.2,” which “make the availability of adjustment of status to previously removed aliens explicit.” Id. at 793.[5] Accordingly, we concluded that “[i]n the absence of a more complete agency elaboration of how its interpretation of § 212(a)(9) can be reconciled with its own regulations, we must defer to the regulations rather than to the informal guidance memorandum.” Id. at 794. The panel denied rehearing, over the dissent of Judge Gould. Perez-Gonzalez v. Gonzales, 403 F.3d 1116, 1117-20 (9th Cir.2005) (Gould, J., dissenting) (dissenting from denial of motion to reconsider denial of petition for panel rehearing).
The BIA subsequently issued In re Torres-Garcia, 23 I. & N. Dec. 866 (BIA 2006), accepting our invitation to provide “a more complete agency elaboration,” Perez-Gonzalez, 379 F.3d at 794, of the conflict between these provisions of the INA. The BIA concluded that “the Ninth Circuit’s analysis regarding the availability of a retroactive waiver of the ground of inadmissibility set forth at section 212(a)(9)(C)® contradicts the language and purpose of the Act and appears to have proceeded from an understandable, but ultimately incorrect, assumption regarding the applicability of 8 C.F.R. § 212.2.” Torres-Garcia, 23 I. & N. Dec. at 873. The BIA noted that 8 C.F.R. § 212.2 “was not promulgated to implement current section 212(a)(9) of the Act,” but “implement[ed] statutory provisions that were repealed by the IIRIRA.” Id. at 874-75. It further noted that our decision in Perez-Gonzalez effectively allowed § 245® to function as a means to “circumvent the statutory 10-year limitation on section 212(a)(9)(C)(ii) waivers” by allowing aliens to “simply reenter[ ] unlawfully before requesting the waiver,” given that “it is the alien’s unlawful reentry without admission that makes section 212(a)(9)(C)® applicable in the first place.” Id. at 876. The BIA noted that under our reading of § 212, an alien could obtain a “waiver nunc pro tunc even though such a waiver would have been unavailable to him had he sought it prospectively, thereby placing him in a better position by asking forgiveness than he would have been in had he asked permission.” Id.
Next, in Acosta v. Gonzales, 439 F.3d at 556, we extended the reasoning of Perez-Gonzalez to INA § 212(a)(9)(C)(i)(I) — the provision at issue in this case — and held that aliens inadmissible under that section nonetheless remained eligible for adjustment of status under § 245®. We emphasized that “Perez-Gonzalez appears to control the issue ... before us” and that “any attempt to distinguish the present case from Perez-Gonzalez based on the different grounds of inadmissibility involved would be unpersuasive.” Id. at 554. We did not take note of the BIA’s contrary *511 decision in Torres-Garcia, which had been issued just one month earlier.
The following year, the BIA revisited the question we answered in Acosta and again rejected our reasoning. Briones, 24 I. & N. Dec. 355. It explained that § 212(a)(9)(C)(i)(I) applies only to aliens “who have departed the United States after accruing an aggregate period of ‘unlawful presence’ of more than 1 year and who thereafter entered or attempted to reenter the United States unlawfully.” Id. at 365-66. The BIA observed that § 212(a)(9)(C)(i)(I) could therefore trump § 245(i) without rendering the latter provision superfluous. Id. It noted that “in every other case where Congress has extended eligibility for adjustment of status to inadmissible aliens ... it has done so unambiguously, either by negating certain grounds of inadmissibility outright or by providing for discretionary waivers of inadmissibility, or both.” Id. at 367. Accordingly, the BIA decided that despite our decision in Acosta, there was “little merit in the ... argument ... that it would be incompatible with the remedial purpose of section 245(i) to make adjustment of status unavailable to ... aliens [inadmissible under section 212].” Id. at 370. The BIA concluded that “aliens who are inadmissible under section 212(a)(9)(C)(i)(I) of the [INA] cannot qualify for section 245(i) adjustment, absent a waiver of inadmissibility.” Id. at 371. Briones, however, explicitly declined to decide whether to apply its interpretation to cases arising in the jurisdiction of the Ninth and Tenth Circuits, id. at 371 n. 9, which had both reached contrary conclusions. See Padilla-Caldera v. Gonzales, 453 F.3d 1237 (10th Cir.2005).
2. The Reconciliation
That same year, we began the process of reevaluating our prior decisions in light of the BIA’s decisions in Torres-Garcia and Briones. First, we addressed the effect of Torres-Garcia in Duran Gonzales I, 508 F.3d 1227. Applying the framework established by Chevron and Brand X, we deferred to the BIA’s interpretation of § 212(a)(9)(c) in Torres-Garcia, and overruled Perez-Gonzalez. Id. at 1242. We found that in Perez-Gonzalez we had determined that the relevant sections of the INA were ambiguous and that the BIA had not, at that time, issued a controlling decision that resolved this ambiguity. Id. at 1237-38; see Brand X, 545 U.S. at 982, 125 S.Ct. 2688. We concluded that the BIA’s interpretation of § 212(a)(9)(C)(i)(II) in Torres-Garcia was “clearly reasonable and is therefore entitled to Chevron deference under Brand X.” Duran Gonzales I, 508 F.3d at 1242. Accordingly, we concluded that “we are bound by the BIA’s interpretation of the applicable statutes in In re Torres-Garcia, even though that interpretation differs from our prior interpretation in Perez-Gonzalez.” Id.
In 2010, the BIA issued its most recent published opinion on this subject. In re Diaz and Lopez rejected the alien’s argument that Briones should not apply in cases arising in the jurisdiction of the Ninth Circuit due to our decision in Acosta. 25 I. & N. Dec. 188, 190-91 (BIA 2010). The BIA noted that the decision in Acosta was “constrained by” our previous decision in Perez-Gonzalez, which had subsequently been overruled in Duran Gonzales I. Id. at 190. Citing Brand X, the BIA therefore concluded that “[n]either the Immigration Judge nor the Board remains bound by the Ninth Circuit’s decision in Acosta in light of our subsequently issued decision in Matter of Briones and the Ninth Circuit’s decision in [Duran] Gonzales [/] to overrule Perez-Gonzalez.” Id.
*512 With that background, we now turn to the case before us.
III. DISCUSSION
A. Whether Briones Is Entitled to Chevron Deference
We must first determine whether aliens who are inadmissible under INA § 212(a)(9)(C)(i)(I) may nonetheless apply for adjustment of status under § 245(i). Deferring to the BIA’s decision in Briones, we hold that they may not.[6]
1. Statutory Ambiguity
We begin by asking whether Congress has “spoken to the precise question at issue.” Chevron, 467 U.S. at 842,104 S.Ct. 2778. Here, Garfias urges us to reaffirm our holding in Acosta, where we interpreted the ambiguity between § 212(a)(9)(C)(i)(I) and § 245(i) in the absence of an authoritative interpretation by the BIA. However, we see no basis for distinguishing § 212(a)(9)(C)(i)(I) from § 212(a)(9)(C)(i)(II) or for departing from the reasoning of Duran Gonzales I. In Brand X, the Supreme Court held that “[a] court’s prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.” 545 U.S. at 982,125 S.Ct. 2688; see Duran Gonzales I, 508 F.3d at 1235-36. We believe that Acosta was not such a decision.
We wrote in Acosta that “[t]he statutes involved do not clearly indicate whether the inadmissibility provision or the penalty-fee adjustment of status provision should take precedence,” and reached our conclusion by relying heavily on our earlier Perez-Gonzalez decision. Acosta, 439 F.3d at 553-55. Other circuits have also noted that the tension between § 212(a)(9)(C) and § 245(i) creates a statutory ambiguity that cannot be resolved conclusively by resort to the text. See, e.g., Cheruku v. Att’y Gen., 662 F.3d 198, 204 (3d Cir.2011); Renteria-Ledesma v. Holder, 615 F.3d 903, 908 (8th Cir.2010) (“A literal reading of [8 U.S.C.] § 1255® would render the adjustment of status provision a virtual nullity, because aliens who ‘entered the United States without inspection,’ as required by § 1255®(1)(A)(i), generally are not ‘admissible,’ as required by § 1255(i)(2)(A).”); Ramirez v. Holder, 609 F.3d 331, 335-36 (4th Cir.2010); Herrera-Castillo v. Holder, 573 F.3d 1004, 1007-08 (10th Cir.2009); Mora v. Mukasey, 550 F.3d 231, 237-38 (2d Cir.2008); Ramirez-Canales, 517 F.3d at 907-08; see also Lemus-Losa v. Holder, 576 F.3d 752, 760 (7th Cir.2009) (“If the question before us were ... the relation between [8 U.S.C. § 1182(a)(9) ](C)(i)(I) and § 1255® ... we would agree that there is sufficient ambiguity in these provisions to require Chevron deference, and we would find that the BIA has drawn a rational line.”). The BIA has also acknowledged this ambiguity, noting that “the plain language of the statute seems to make ‘entry without inspection’ both a qualifying and a disqualifying condition for adjustment of status.” Briones, 24 I. & N. Dec. at 362.
We previously refused to give deference to the BIA’s interpretation only because it came in the form of a guidance memorandum, which we held was “not entitled to *513 the same rigorous deference due agency regulations.” Acosta, 439 F.3d at 554. In deciding Briones, however, the BIA has issued a formal agency interpretation of the INA and provided a thoroughly developed opinion that disagrees with our interpretation in Acosta. Additionally, our decision in Acosta relied heavily on our reasoning in Perez-Gonzalez, which we have since abrogated in light of the BIA’s decision in Torres-Garcia. See Duran Gonzales I, 508 F.3d at 1242. Because Acosta did not “unambiguously foreclose®” the BIA’s authority to interpret the interplay between § 212(a)(9)(C)(i)(I) and § 245(i), the BIA “remains the authoritative interpreter (within the limits of reason)” of these provisions. Brand X, 545 U.S. at 983, 125 S.Ct. 2688.
2. The Reasonableness of the Agency’s Interpretation
We now turn to whether the BIA’s interpretation of the statutory framework is reasonable. Every circuit to have addressed the issue has concluded that Briones is a reasonable interpretation of § 212(a)(9)(C)(i)(I) and § 245®. See Renteria-Ledesma, 615 F.3d at 908; Ramirez, 609 F.3d at 337; Mora, 550 F.3d at 239; Ramirez-Canales, 517 F.3d at 910. We agree with our sister circuits and hold that the BIA’s interpretation is reasonable.
The BIA noted that the current ambiguity between § 212(a)(9)(C) and § 245® was a consequence of a switch from the use of the term “deportable” to “inadmissible” to describe aliens who entered without inspection. See Briones, 24 I. & N. Dec. at 363. The BIA observed that Congress has generally limited adjustment of status to those aliens who have been “inspected and admitted” into the United States. Id. at 359. Section 245® authorized a “limited departure from the general ‘inspection and admission’ requirement.” Id. at 360. Although Congress intended the requirement to discourage aliens from moving to the United States before becoming eligible for permanent residence, Congress found that the “inspected and admitted” policy forced relatives of permanent residents to leave the country just so they could apply for an immigrant visa at a U.S. embassy or consulate. Id. at 359-60.
The BIA then resolved the textual ambiguity by explaining that “the classes of aliens described in sections 245(i)(l)(A) and 212(a)(9)(C)(i)(I) are [not] coextensive.” Id. at 365. That is, § 245® applies to some aliens who are physically present in the United States and entered without inspection, but § 212(a)(9)(C)(i)(I) precludes its application to those aliens who entered the country without inspection, stayed for at least one year, departed the country, and then “enter[ed] or attempted] to reenter the United States without being admitted.” 8 U.S.C. § 1182(a)(9)(C)®. The BIA supported its interpretation of § 212(a)(9)(C)(i)(I) by pointing out that subsection (a)(9)(C) is entitled “ ‘Aliens unlawfully present after previous immigration violations.’ ” Briones, 24 I. & N. Dec. at 366 (quoting 8 U.S.C. § 1182(a)(9)(C)). The BIA emphasized that “[i]t is the entry or attempted entry of an alien subsequent to his accrual of more than 1 year of unlawful presence that triggers inadmissibility under section 212(a)(9)(C)(i)(I), and not mere unlawful presence for more than 1 year.” Id.
The latter class of aliens — whom the BIA refers to as “recidivists”' — are not eligible for adjustment of status under § 245® because otherwise § 245® status adjustment would be “available to a whole new class of aliens who had never been eligible for it.” Id. at 365-67. Additionally, the BIA deemed it “of crucial importance” to its interpretation “that in every other case where Congress has extended *514 eligibility for adjustment of status to inadmissible aliens ... it has done so unambiguously, either by negating certain grounds of inadmissibility outright or by providing for discretionary waivers of inadmissibility, or both.” Id. at 367.
This is a permissible reading of the statute. In light of the BIA’s reasoned opinion, we hold that Briones is entitled to Chevron deference. See Brand X, 545 U.S. at 982, 125 S.Ct. 2688. We conclude that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) are not eligible for adjustment of status under § 245(i), and overrule Acosta to the extent it holds otherwise.
B. Retroactivity of the Briones Rule
Garfias contends that even if Briones controls the interpretive question in this case, the BIA should not have applied its conclusion to his case. In general, an agency is free to implement new administrative policies through adjudicative procedures instead of rulemaking. See SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 201-03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). We have added that an agency “may act through adjudication to clarify an uncertain area of the law, so long as the retroactive impact of the clarification is not excessive or unwarranted.” Montgomery Ward & Co. v. FTC, 691 F.2d 1322, 1328 (9th Cir.1982).
However, the Brand X twist here complicates the situation somewhat: because we have determined that our prior decision in Acosta must be overruled in light of the BIA’s decision in Briones, it is not clear whether we, as a judicial decisionmaker, have changed the law, or whether it is the agency that has changed the law.[7] Thus, there are two possible answers to the retroactivity question: the analysis in Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), which sets forth retroactivity factors to consider when a court changes the law, and the Montgomery Ward test, 691 F.2d at 1333, which sets forth retroactivity factors to consider when an agency changes its law. Before turning to this question, we consider whether the BIA should have the opportunity to address the retroactivity question first, and whether a retroactivity analysis is even required.
1. Exhaustion of Administrative Remedies
To begin with, we consider whether to address this issue for the first time on appeal. Garfias did not ask the BIA to consider the retroactive application of its decision in the first instance, although the second time his case was before the Board, the government had raised the argument that the BIA should follow Briones rather than Acosta.
We have said that the exhaustion of administrative remedies with respect to the retroactivity issue is not required, except to invite the agency to correct its own error, if “record development is unnecessary and the [agency] has no special expertise to do the retroactivity analysis.” Chang v. United States, 327 F.3d 911, 925 (9th Cir.2003). Some courts have concluded that retroactivity is a question of law, and no deference to the agency’s decision regarding retroactivity is appropriate, see, e.g., Microcomputer Tech. Inst. v. Riley, *515 139 F.3d 1044, 1051 (5th Cir.1998); Mason Gen. Hosp. v. Sec’y of Dep’t of Health & Human Servs., 809 F.2d 1220, 1224 (6th Cir.1987); Retail, Wholesale & Dep’t Store Union v. NLRB (Retail Union), 466 F.2d 380, 390 (D.C.Cir.1972), while others have taken a more deferential approach to the agency’s determination, NLRB v. W.L. Miller Co., 871 F.2d 745, 748 n. 2 (8th Cir.1989) (collecting cases); Yakima Valley Cablevision, Inc. v. FCC, 794 F.2d 737, 746 (D.C.Cir.1986) (an agency must explain its retroactivity decision before a court can review it).
We think that our position in Chang remains a sound one. If there is no need to defer to an agency’s position on the issue, there is no particular reason to remand to allow the agency to consider in the first instance whether the rule should be applied retroactively. Because no further record development is necessary and the parties have briefed the issue thoroughly before this court, we will consider the question in the first instance.
2. Whether Any Retroactivity Analysis Is Required
Next, we reject the government’s position that the BIA, as the authoritative interpreter of an ambiguous statute, has issued an interpretation in Briones that is comparable to “[a] judicial construction of a statute” and “is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.” Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (emphasis added). Although it is true that the BIA is the authoritative arbiter of the meaning of the ambiguous provisions of the INA at issue here, Brand X, 545 U.S. at 983, 125 S.Ct. 2688, its role is considerably more circumscribed than that of an Article III court construing federal law (where no agency is entitled to deference) or a state’s high court construing its own law.
That principle is vividly illustrated by the present situation. In Acosta, we issued a binding interpretation of ambiguous provisions of the INA, which was authoritative in this circuit at least until the agency issued a reasonable interpretation to the contrary. If the agency had never done so, Acosta would still be good law. Cf. Brand X, 545 U.S. at 983, 125 S.Ct. 2688. We construed the statute pursuant to “[t]he judicial Power” vested in us over “Cases ... arising under ... the Laws of the United States.” U.S. Const, art. Ill, § 1, § 2, cl. 1. The BIA’s authority to say what the law means, however, rests on the “executive Power” vested in the President and his general charge to “take Care that the Laws be faithfully executed.” U.S. Const, art. II, § 1, § 3. We defer to an agency not because it is better situated to interpret statutes, but because we have determined that Congress created gaps in the statutory scheme that cannot be filled through interpretation alone, but require the exercise of policymaking judgment. See Chevron, 467 U.S. at 865, 104 S.Ct. 2778 (“[A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration’s views of wise policy to inform its judgments.”). “Deference under Chevron to an agency’s construction of a statute that it administers is premised on the theory that a statute’s ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); see Brand X, 545 U.S. at 980, 125 S.Ct. 2688. Thus, the BIA’s interpretation of the INA is not a once-and-for-always definition of what the *516 statute means, but an act of interpretation in light of its policymaking responsibilities that may be reconsidered “on a continuing basis.” Chevron, 467 U.S. at 864, 104 S.Ct. 2778. We defer to the agency out of separation-of-powers concerns for the policymaking function of the executive because we are “not part of either political branch of the Government.” Id. at 865, 104 S.Ct. 2778. But, for similar reasons, the executive may not insist that we treat the BIA’s construction of the INA as though it were a court of last resort exercising “judicial Power”; it is not. Indeed, the BIA equivocated over whether, post-Briones, it would acquiesce in our decision in Acosta. See Briones, 24 I. & N. Dec. at 371 n. 9 (“We need not decide here whether to apply our holding in the Ninth and Tenth Circuits.”).[8]
We conclude that we must treat an agency decision that is contrary to a ruling previously set forth by a court of appeals and, as a result of Chevron and Brand X, prompts the court of appeals to defer to the agency, as we would if the agency had changed its own rules. To do otherwise would ignore the effect of Chevron and treat the agency decision as though it had issued from the court itself. To the extent our precedent suggests the contrary, it is overruled in favor of the analysis we adopt today. See, e.g., Duran Gonzales v. Dep’t of Homeland Sec. (Duran Gonzales II), 659 F.3d 930, 939-41 (9th Cir.2011); Morales-Izquierdo v. Dep’t of Homeland Sec., 600 F.3d 1076, 1087-91 (9th Cir.2010).
Chief Judge Kozinski, concurring in the judgment, asserts that we need not conduct a retroactivity analysis at all. See Kozinski Concur. Op. at 529. However, he applies retroactivity principles to conclude that retroactivity analysis does not apply, effectively resolving the retroactivity question against Garfias.[9] Id. at 529-30. We disagree with this approach. It conflates the result of a retroactivity analysis with the process of conducting it. We will perform the retroactivity analysis directly instead of applying the same principles to conclude that the analysis does not apply. See discussion infra pp. 521-23.
*517 3. Which Retroactivity Test Applies: Chevron Oil or Montgomery Ward
We now turn to the question of the appropriate test to apply to determine if Briones applies to Garfias retroactively. Chevron Oil Co. v. Huson addresses whether a rule changed by a court should be applied retroactively. 404 U.S. at 106-07, 92 S.Ct. 349.[10] Since Chevron Oil was decided, the Supreme Court has strictly limited its application, see Harper v. Va. Dep’t of Taxation, 509 U.S. 86, 95-96, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), and at least one court has held that Chevron Oil has been overruled altogether, see United Food & Commercial Workers Int’l Union, Local No. 150-A v. NLRB, 1 F.3d 24, 35 (D.C.Cir.1993); see also Nunez-Reyes v. Holder, 646 F.3d 684, 691-92 (9th Cir. 2011) (en banc) (discussing these developments). The Supreme Court has emphasized that retroactive application is the presumptive norm, and implied that any exceptions to this rule must be narrow. Harper, 509 U.S. at 95-96, 113 S.Ct. 2510. It has also emphasized that we are not to perform a retroactivity analysis on a case-by-case basis, but that we must decide whether a rule should be retroactive (or not) as applied to all cases currently pending. Id. at 96-97, 113 S.Ct. 2510.
Last year, we affirmed the continuing validity of the Chevron Oil rule in this circuit. Nunez-Reyes, 646 F.3d at 692 (“As a circuit court, even if recent Supreme Court jurisprudence has perhaps called into question the continuing viability of its precedent, we are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court. We therefore remain bound by Chevron Oil.” (citations omitted) (internal quotation marks omitted)); see also id. at 698 (Ikuta, J., concurring in part and dissenting in part) (“Although the reasons for severely limiting non-retroactive decisionmaking are clearly set out in Harper, the Court did not expressly overrule Chevron Oil. We therefore must continue to consider Chevron Oil where we are announcing a new rule of law for the first time and the parties have fairly raised the issue.” Id. (footnote omitted) (citation omitted)). Thus, where the party has fairly raised the issue we “apply the three-pronged test outlined in Chevron Oil (1) in a civil case; (2) when we announce a new rule of law, as distinct from applying a new rule that we or the Supreme Court previously announced; (3) and when the new rule does not concern our jurisdiction.” Id. at 691 (majority opinion).
For the reasons we explained in the previous section, however, we do not think the Chevron Oil test is well adapted to the Brand X situation. We are not announcing a new rule of law here because we have changed our mind about the correctness of our prior rule or because we have been corrected by a higher court. Rather we are approving and applying a new rule that the BIA announced in Briones and to which we must defer under the Brand X *518 framework.[11] As we have noted, the BIA’s decision fills a statutory gap and is an exercise of its policymaking function. Chevron Oil, as a framework for deciding when to apply a change in a court’s decision retroactively, is, as a purely threshold matter, not the appropriate framework.
We believe Montgomery Ward is the better fit for this situation. Montgomery Ward addresses the situation when a “new administrative policy [is] announced and implemented through adjudication.” 691 F.2d at 1328 (citing Chenery II, 332 U.S. at 202, 67 S.Ct. 1575). In such a case, “the agency may act through adjudication to clarify an uncertain area of the law, so long as the retroactive impact of the clarification is not excessive or unwarranted.” Id. We explained that although the agency was free to change or modify its position, the agency’s interest in doing so must be “balanc[ed] [against] a regulated party’s interest in being able to rely on the terms of a rule as it is written.” Id. at 1333. To implement this balancing test, we adopted the framework set forth by the D.C. Circuit in Retail Union:
(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
Id. at 1333 (quoting Retail Union, 466 F.2d at 390).
Although the five-factor Montgomery Ward test was developed in the context of an agency overturning its own rule, it has also been applied when court decisions formed part of the background. See, e.g., Miguel-Miguel v. Gonzales, 500 F.3d 941, 951-53 (9th Cir.2007) (noting that “both the BIA and this court” had adopted the rule at issue before the BIA decided to exercise its statutory discretion to change it); ARA Servs., Inc. v. NLRB, 71 F.3d 129, 135 (4th Cir.1995) (noting that “the rule proposed by the Board represents an abrupt break with well-settled policy” because it “purports to over-turn numerous court precedents and Board decisions” (internal quotation marks omitted)); Local 900, Int’l Union of Elec., Radio & Mach. Workers v. NLRB, 727 F.2d 1184, 1195 (D.C.Cir.1984) (“Given the confusion in the Board’s and courts’ decisions over the years, the new rule cannot be called an abrupt break with a well-settled policy....”). Although none of these cases actually analyzed the effect of a prior court decision on the Montgomery Ward framework, they indicate that the test is flexible enough to account for both agency and court precedent when considering the relevant legal background.
The Montgomery Ward test is more flexible than Chevron Oil, and allows us to take into account the intricacies of a Brand X problem, which are typically absent in a case where we have overruled our own decisions, as in Nunez-Reyes. Although Montgomery Ward involved an agency amending or overturning its own precedent and Brand X involved an agency disagreeing with a court’s prior decision, the considerations in both situations are similar. When an agency consciously overrules or otherwise alters its own rule *519 or regulation, we presume that it does so as an exercise of its judgment. Similarly, when an agency expressly considers and openly departs from a circuit court decision, we must presume that the agency has considered the court’s reading of the statute in connection with the policies of the administration and has consciously disagreed with the court as a matter of its policymaking function. See, e.g., TorresGarda, 23 I. & N. Dec. at 873 (“[W]e believe the Ninth Circuit’s analysis regarding the availability of a retroactive waiver of the ground of inadmissibility set forth at section 212(a)(9)(C)(i) contradicts the language and purpose of the Act....”).
Importantly, because Chevron and Brand X are grounded in the deference we owe to agency policymaking, neither the presumption in favor of retroactive application nor the prohibition on considering retroactivity on a case-by-case basis applies.[12] Our concerns sound in equity. See Chenery II, 332 U.S. at 203, 67 S.Ct. 1575 (“[Rjetroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.”). Both the presumption in favor of retroactive application, and the rule that a retroactivity analysis is not to be performed on a case-by-case basis with regard to judicial adjudications stem from the Supreme Court’s directive in Harper “prohibiting] the erection of selective temporal barriers to the application of federal law in noncriminal cases.” 509 U.S. at 97, 113 S.Ct. 2510. As the Court explained,
[w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.
Id.; see James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 540-43, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (plurality opinion).
Although we have not previously considered whether Harper applies with equal force to an agency’s creation of new law through adjudication, the other circuits to consider this issue have concluded that it does not. See, e.g., ARA Servs., 71 F.3d at 135 n. 3 (“[T]he fact that Board adjudication has long existed in the interstices of retroactivity law argues in favor of a case-by-case approach to such rulings, rather than an attempt to fit them within one of the above global retroactivity principles.”); Laborers’ Int’l Union v. Foster Wheeler Corp., 26 F.3d 375, 387 n. 8 (3d Cir.1994) (concluding that the rationales supporting the retroactivity of judicial decisions “do not apply analogously to administrative agency adjudications”); Dist. Lodge 6J, Int’l Ass’n of Machinists & Aerospace Workers v. NLRB, 949 F.2d 441, 447 (D.C.Cir.1991) (“These Article III grounds are inapplicable to administrative adjudications, so Beam does not clearly foreclose selective retroactivity here.”).
In every case in which we have applied the Montgomery Ward test, we have done so on a case-by-case basis, for example, by analyzing whether a petitioner actually relied on a past rule, or by concluding that retroactivity as applied is impermissible. See Miguel-Miguel, 500 F.3d at 953 *520 (“[B]ecause the Montgomery Ward analysis tilts decidedly in Miguel’s favor, we hold that retroactive application of the [new] test to his case was impermissible.” (emphasis added)); Chang v. United States, 327 F.3d 911, 929 (9th Cir.2003) (“[A]fter applying the Montgomery Ward factors, we conclude that the application of the INS’s intended change ... is impermissibly retroactive as applied to Appellants.” (emphasis added)); Great W. Bank v. Office of Thrift Supervision, 916 F.2d 1421, 1432 (9th Cir.1990) (concluding that the bank in that case could not show justifiable reliance); Oil, Chem. & Atomic Workers Int’l Union, Local 1-547 v. NLRB, 842 F.2d 1141, 1145 (9th Cir.1988) (finding a “significant” burden would be imposed on that litigant by retroactive application of the new rule); Montgomery Ward, 691 F.2d at 1334 (concluding that the new rule’s retroactive impact would place an “unfair burden” on the litigant department store as compared to its similarly situated competitors). In light of this consensus, the absence of any guidance from the Supreme Court, and our conclusion that agency decisions are not analogous to court decisions, we see no need to reevaluate the Montgomery Ward case-by-case test after Harper.
Therefore, we hold that when we overturn our own precedent following a contrary statutory interpretation by an agency authorized under Brand X, we analyze whether the agency’s statutory interpretation (to which we defer) applies retroactively under the test we adopted in Montgomery Ward, if the issue is fairly raised by the parties.
4. Applying the Test to Garfias’s Case
Applying this test to the case before us, we conclude that Garfias cannot avoid the retroactive effect of Briones on his case.
The first factor of the Montgomery Ward test — whether the issue is one of first impression — was developed in a very different context and may not be suited to our situation. Retail Union, from which this factor was adopted, involved a dispute before the National Labor Relations Board (“NLRB”) between a company and union workers with respect to workers who had been on strike, were permanently replaced, and were not offered the vacancies that opened when their replacements departed. 466 F.2d at 383-84, 387. Just before the NLRB’s decision in Retail Union, another union had succeeded in convincing the Board to overturn “a well settled rule, enunciated and applied by the Board, that when an employer permanently replaced an economic striker, he was under no obligation thereafter to treat that striker other than as a new applicant for employment.” Id. at 387. For the D.C. Circuit, a case of “first impression” in this context meant something different from what we ordinarily refer to as a “case of first impression.” In the Retail Union context, a case of “first impression” was a case in which one party had successfully urged the NLRB to change its rule; a case of “second impression” was any subsequent case brought before the NLRB. The court was concerned that denying retroactive effect in a case of first impression would “deny the benefits of a change in the law to the very parties whose efforts were largely responsible for bringing it about [and] might have adverse effects on the incentive of litigants to advance new theories or to challenge outworn doctrines.” Id. at 390. Additionally, to deny retroactive effect in a case of first impression would effectively render the NLRB’s decision an advisory opinion and raise serious questions as to whether the NLRB had conducted a rulemaking in the guise of an adjudication. See NLRB v. WymanGordon Co., 394 U.S. 759, 763-66, 89 S.Ct. *521 1426, 22 L.Ed.2d 709 (1969) (plurality opinion); see also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 221, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). Instead, the court in Retail Union recognized that it was in cases of “second impression” before the NLRB that concerns might arise over “lack of notice [to the party against whom the standard is to be applied retroactively] and the [party’s] degree of reliance on former standards.” 466 F.2d at 390 n. 22; see also Migue-Miguel, 500 F.3d at 951. In other words, the court was more likely to apply the new rule in a case of “first impression,” but less likely to apply it in a case of “second impression.”
Retail Union’s concerns over issues of “first impression” and “second impression” arose in the litigation-intensive context of the NLRB regulating labor disputes between private parties. These concerns may not be as well suited to the context of immigration law, where one of the parties will always be the government. Moreover, the NLRB is virtually unique among agencies in its “long-standing reliance on adjudication” and the common-law method. See Mark H. Grünewald, The NLRB’s First Rulemaking: An Exercise in Pragmatism, 41 Duke L.J. 274, 278 (1991). The BIA, by contrast, relies on a complex combination of regulations promulgated by the Attorney General, its own interpretative decisions, and a detailed framework of statutes to establish national immigration policy. As Garfias is not analogously situated to either the union or the company in Retail Union because it was the government who brought about the change in the law, this Retail Union factor does not weigh in favor of either side. In any event, any question of unfairness in applying a new rule in cases of “first impression” or “second impression,” such as surprise or detrimental reliance, is fully captured in the second and third Montgomery Ward factors. See Montgomery Ward, 691 F.2d at 1333-34 (considering the first three factors together as a single criterion).
The second and the third factors are closely intertwined. If a new rule “represents an abrupt departure from well established practice,” a party’s reliance on the prior rule is likely to be reasonable, whereas if the rule “merely attempts to fill a void in an unsettled area of law,” reliance is less likely to be reasonable. Retail Union, 466 F.2d at 390-91. We have made it clear in this circuit that these two factors will favor retroactivity if a party could reasonably have anticipated the change in the law such that the new “requirement would not be a complete surprise.” Montgomery Ward, 691 F.2d at 1333-34; see also Great W. Bank, 916 F.2d at 1432. Decisions from other circuits, especially the D.C. Circuit, support this conclusion. In Clark-Cowlitz Joint Operating Agency v. FERC, an en banc court determined that any reliance interest was diminished because the previous rule was only in place for six months, and the rule’s “presumably sunny prospects” were “beclouded” by the possibility of being overturned on appeal. 826 F.2d 1074, 1083-84 (D.C.Cir.1987) (en banc). In District Lodge 61, International Ass’n of Machinists & Aerospace Workers v. NLRB, the D.C. Circuit held that multiple changes in the agency’s position regarding the proper rule precluded reliance because the final decision “was not an extreme or unpredictable step,” much less a “radical transformation.” 949 F.2d at 447-48; see also Verizon Tel. Cos. v. FCC, 269 F.3d 1098, 1111 (D.C.Cir.2001) (reliance is “something short of reasonable” “[i]n light of the ongoing legal challenges” to the old rule); Gen. Am. Transp. Corp. v. ICC, 872 F.2d 1048, 1061 (D.C.Cir.1989) (reliance is discounted because the parties were aware of the precedent’s vulnerability); Elec., *522 Radio & Mach. Workers, 727 F.2d at 1195 (“Given the confusion in the Board’s and courts’ decisions over the years, the new rule cannot be called an abrupt break with a well-settled policy...
In this case, Garfias identifies only two specific reliance interests: the payment of a $1000 penalty fee to file his application, and the fact that, by filing for adjustment of status, he admitted his unlawful presence in this country to the INS. We conclude that neither of these factors favors Garfias because he filed his application well in advance of any court or agency decision holding that inadmissibility under § 212(a)(9)(C) is not a barrier to status adjustment under § 245(i). Garfias first filed his application in 2002, but Perez-Gonzalez and Acosta were not decided until two and four years later, respectively. Thus, Garfias clearly did not file his application in reliance on Acosta, or even the analogous decision in Perez-Gonzalez.
The only window in which Garfias’s reliance interest based on our previous rule might have been reasonable is the 21-month period in 2006 and 2007 between the issuance of Acosta and Briones. After Briones was issued, he was on notice of Acosta’s vulnerability. At oral argument, Garfias directed us to the costs he expended when renewing his application for status adjustment in front of the IJ on remand, which occurred during this period between Acosta and Briones. For example, he had to renew his medical examination paperwork. However, there is nothing in the record which discloses the cost to Garfias of such paperwork, and the primary reliance interest identified — the penalty filing fee — is not implicated by the proceedings on remand.
Nor can we give much weight to the fact that Garfias admitted to his illegal presence within the United States by filing for adjustment of status. Garfias’s situation is similar to the petitioner in FemandezVargas v. Gonzales, who “tipped off the authorities to his illegal presence” by “fil[ing] an application to adjust his status to that of lawful permanent resident [under 8 U.S.C.] § 1255(i).” 548 U.S. 30, 35, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). The Supreme Court rejected the notion that the expanded provisions of IIRIRA should not be applied to him retroactively for other reasons, id. at 38-42, 126 S.Ct. 2422, but remarked that “retroactivity law ... is meant to avoid new burdens imposed on completed acts, not all difficult choices occasioned by new law,” and the petitioner only “complainfed] of ... the application of new law to continuously illegal action within his control both before and after the new law took effect,” id. at 46, 126 S.Ct. 2422. The Court then rejected the petitioner’s position that he had “a right to continue illegal conduct indefinitely under the terms on which it began.” Id. Nothing in Briones “impair[s] rights a party possessed when he acted, increase^] a party’s liability for past conduct, or imposed] new duties with respect to transactions already completed.” Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Applying this logic to Garfias’s situation, we cannot help but conclude that we should not be overly solicitous of Garfias’s interest in continuing to avoid the consequences of his violation of our immigration laws.
Moreover, the reasons that require us to defer to the BIA’s decision in Briones also work against Garfias in this case. From the outset, the tension between § 212(a)(9)(C) and § 245(i) was obvious. That ambiguity in the law — which resulted in a six-year dialogue between the BIA and us — should have given Garfias no assurances of his eligibility for adjustment of status. Garfias might have had reason to be encouraged after our generous reading *523 of the statute in Perez-Gonzalez and Acosta, but, even then, any reliance he placed on our decisions held some risk because our decisions were subject to revision by the BIA under Chevron and Brand X. Given the specific facts and timing of this case, we conclude that the second and third factors weigh against Garfias.
We recognize that the fourth factor — the degree of burden imposed on Garfias — strongly favors him. Although the relief he applied for is ultimately discretionary, “ ‘[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation.’ ” Migue-Miguel, 500 F.3d at 952 (quoting INS v. St. Cyr, 533 U.S. 289, 325, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). Furthermore, “deportation alone is a substantial burden that weighs against retroactive application of an agency adjudication.” Id.
The fifth factor — the statutory interest in applying a new rule — points in favor of the government because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established. See, e.g., Cazarez-Gutierrez v. Ashcroft, 382 F.3d 905, 912 (9th Cir.2004) (stressing “the strong interest in national uniformity in the administration of immigration laws”). The government’s interest in applying the new rule retroactively may be heightened if the new rule follows from the “plain language of the statute,” Great W. Bank, 916 F.2d at 1432. Here it is clear from the multiple approaches taken to solving this problem that the answer is anything but “plain.” The new rule does not follow from the plain language of the statute because there is an inconsistency between two statutory provisions. The statutory interest in applying the new rule retroactively thus favors the government, but because the government cannot claim that the new rule follows from the plain language of the statute, the factor only leans in the government’s direction.
In sum, although we recognize the burden that retroactivity imposes on Garfias, the second, third, and fifth factors in this case outweigh that burden. When he filed his § 245(i) application in 2002, Garfias had no reliance interest because the law was not settled or well established. Garfias’s is not a case “where the [agency] had confronted the problem before, had established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted.” Retail Union, 466 F.2d at 391. We hold that the BIA properly applied the Briones rule to Garfias.[13]
C. Voluntary Departure Regulations
Finally, Garfias challenges the automatic termination of the BIA’s grant of voluntary departure. First, he argues that notwithstanding 8 C.F.R. § 1240.26(i), which provides for the automatic termination of a voluntary departure grant upon the filing of a petition for review, we retain equitable authority to stay the voluntary departure period. Second, he argues that the Attorney General exceeded his authority when he promulgated the regulation pursuant to 8 U.S.C. § 1229c(e).
Section 1229c(e) authorizes the Attorney General “by regulation [to] limit eligibility for voluntary departure under this section for any class or classes of aliens.” 8 U.S.C. § 1229c(e).[14] The regulation at is *524 sue provides, in relevant part, that if an alien files a petition for review of a final removal order, “any grant of voluntary departure shall terminate automatically upon the filing of the petition or other judicial challenge.” 8 C.F.R. § 1240.26G). However, “an alien granted the privilege of voluntary departure ... will not be deemed to have departed under an order of removal if the alien departs the United States no later than 30 days following the filing of a petition for review.” Id. The rule was effective as of January 20, 2009. See Voluntary Departure: Effect of a Motion to Reopen or Reconsider or a Petition for Review, 73 Fed.Reg. 76,927, 76,927 (Dec. 18, 2008).
1. Whether the Court’s Equitable Authority Survived the Regulation
We first consider whether we have equitable authority to stay Garfias’s voluntary departure period regardless of 8 C.F.R. § 1240.26(i). We conclude that we do not.
The Supreme Court has explicitly reserved the question of whether courts retain equitable jurisdiction to grant stays of voluntary departure periods pending appellate review. See Dada v. Mukasey, 554 U.S. 1, 10-11, 128 S.Ct. 2307, 171 L.Ed.2d 178 (2008) (“[S]ome Federal Courts of Appeals have found that they may stay voluntary departure pending consideration of a petition for review on the merits. This issue is not presented here, however, and we leave its resolution for another day.” (citations omitted)). Previously, we held that we have equitable authority to stay a petitioner’s voluntary departure period. El Himñ v. Ashcroft, 344 F.3d 1261, 1262-63 (9th Cir.2003). Our sister circuits, except for the Fourth Circuit, agreed. See, e.g., Thapa v. Gonzales, 460 F.3d 323, 332 (2d Cir.2006); Obale v. Att’y Gen., 453 F.3d 151, 157 (3d Cir.2006); Bocova v. Gonzales, 412 F.3d 257, 267-68 (1st Cir. 2005) (rejecting the government’s argument as “sheer persiflage”); Lopez-Chavez v. Ashcroft, 383 F.3d 650, 654 (7th Cir.2004); Rife v. Ashcroft, 374 F.3d 606, 615-16 (8th Cir.2004); Nwakanma v. Ashcroft, 352 F.3d 325, 327 (6th Cir.2003) (per curiam). But see Ngarurih v. Ashcroft, 371 F.3d 182, 194 (4th Cir.2004) (“Having concluded ... that 8 U.S.C. § 1252(a)(2)(B) precludes judicial review of the BIA’s order granting voluntary departure, we cannot evade this statutory directive by resort to equity.”).
However, each of these decisions was reached before the Attorney General promulgated 8 C.F.R. § 1240.26® in 2008. The First, Third, and Sixth Circuits have recently acknowledged that this regulation resolves the question of whether courts have authority to stay the voluntary departure period pending review, since it provides for the automatic termination of that period. See Hachem, 656 F.3d at 438 (“Prior to the promulgation of this regulation, there was a circuit split on the issue of whether or not a court of appeals had the discretion to stay voluntary departure. The new regulation resolved that issue.” (citations omitted)); Patel v. Att’y Gen., 619 F.3d 230, 234 (3d Cir.2010) (“Under the plain language of 8 C.F.R. § 1240.26®, we cannot stay a grant of voluntary departure after a petitioner seeks judicial review because the grant has already terminat *525 ed.”); Hakim v. Holder, 611 F.3d 73, 78 (1st Cir.2010) (“That rule amended the voluntary departure regulation, which now, in part, provides that a grant of voluntary departure on or after January 20, 2009, automatically terminates with the filing of a petition for review.”).
We agree with our sister circuits. Garfias has given us no reason to believe that courts possess equitable authority to stay voluntary departure periods contrary to the Attorney General’s regulation. In § 1229c(e), Congress granted the Attorney General the authority to control grants of voluntary departure, and the Attorney General exercised this authority by deciding that a grant of voluntary departure terminates upon the filing of a petition for review. This regulation effectively abrogates our contrary decision in El Himri. 344 F.3d at 1262; see United States v. Oakland Cannabis Buyers’ Coop., 532 U.S. 483, 496, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) (noting that federal courts have equitable discretion “unless a statute clearly provides otherwise”). Accordingly, because the filing of a petition now automatically terminates a petitioner’s grant of voluntary departure, we conclude that, assuming that 8 C.F.R. § 1240.26(i) is valid, we have no authority to issue an equitable stay of Garfias’s voluntary departure period.
2. Whether the Regulation Is Authorized by Statute
The Sixth Circuit has squarely held that 8 C.F.R. § 1240.26® is a reasonable interpretation of § 1229e(e), Hachem, 656 F.3d at 438, and several other circuits have applied the regulation or otherwise noted its existence, see, e.g., Patel, 619 F.3d at 233-34 (noting that Obale, 453 F.3d at 157, has been superseded by the regulation); see also Kimani v. Holder, 695 F.3d 666, 668-69 (7th Cir.2012); Qingyun Li v. Holder, 666 F.3d 147, 150 (4th Cir.2011); Hakim, 611 F.3d at 78; Sanchez-Velasco v. Holder, 593 F.3d 733, 737 (8th Cir.2010). We join the Sixth Circuit in finding the regulation to be a valid exercise of delegated power.
In determining whether an agency regulation is ultra vires, we apply the two-step Chevron analysis. See Mejia v. Gonzales, 499 F.3d 991, 996 (9th Cir.2007). We hold that Congress has unambiguously granted the Attorney General authority to control the scope of voluntary departure grants in § 1229c and that he has reasonably exercised his authority in promulgating the regulation.[15]
Under § 1229e(b)(l), “[t]he Attorney General may permit an alien voluntarily to depart the United States at the alien’s own expense if ... the immigration judge enters an order granting voluntary departure in lieu of removal.” 8 U.S.C. § 1229e(b)(1) (emphasis added). This permissive language affords the Attorney General discretion to decide whether to permit voluntary departure after it has been granted by the immigration judge.[16] If the Attorney Gen *526 eral makes a decision not to permit voluntary departure he effectively terminates the immigration judge’s previous grant. See Van Dinh v. Reno, 197 F.3d 427, 434 (10th Cir.1999) (noting that “the Attorney General’s discretion to permit voluntary departure under § 1229c(b) is specifically conditioned upon the entry of a separate order granting voluntary departure by an immigration judge who must find four conditions to exist before the order may be granted” and that the Attorney General makes a “subsequent decision to allow the alien to depart voluntarily pursuant to that order”); of. Muigai v. U.S. INS, 682 F.2d 334, 336-37 (2d Cir.1982) (“The grant or denial of voluntary departure lies within the broad discretion of the Attorney General and his delegates in the INS. It is permitted only in meritorious cases and may be terminated by the Attorney General upon a showing of abuse.” (citation omitted)). Since Congress has also granted the Attorney General the general power to “establish such regulations ... as [he] determines to be necessary for carrying out” his authority under the INA, 8 U.S.C. § 1103(g)(2), the Attorney General properly issued 8 C.F.R. § 1240.26(f) pursuant to his discretion to terminate voluntary departure under 8 U.S.C. § 1229c(b)(1) and his authority under § 1103(g)(2) to issue regulations he deems necessary. See Ha-chem, 656 F.3d at 438 (“The statute makes clear that the grant of voluntarily departure is a discretionary matter. No alien is automatically entitled to such a grant. The Attorney General has reasonably created rules by which this discretion should be governed, just as the statute empowered him to do.”).
Moreover, § 1229c(e), provides additional support for 8 C.F.R. § 1240.26(f). Section 1229c(e) expressly authorizes the Attorney General “by regulation [to] limit eligibility for voluntary departure under [§ 1229c] for any class or classes of aliens.” 8 U.S.C. § 1229c(e) (emphasis added). This section gives the Attorney General authority to issue regulations explaining how he will exercise his discretion under § 1229c(b)(1). See, e.g., Dekoladenu v. Gonzales, 459 F.3d 500, 506 n. 5 (4th Cir.2006) (“The statute does not guarantee voluntary departure even to eligible aliens. Rather, it ... authorizes the Attorney General to issue regulations limiting eligibility for voluntary departure for any class or classes of aliens. As a practical matter, only a relatively small percentage of removable aliens are granted voluntary departure.” (citation omitted) (internal quotation marks omitted) (alterations omitted)), overruled on other grounds by Dada, 554 U.S. at 6-8, 128 S.Ct. 2307; Cervantes-Ascencio v. INS, 326 F.3d 83, 86 (2d Cir. 2003) (“Promulgating limits on eligibility for voluntary departure involves broad discretion by the INS, as does granting or denying voluntary departure. This discretionary component not only substantially curtails our review authority, but also precludes entitlement to such relief as a matter of right.” (citations omitted)). The Attorney General’s regulation is consistent with § 1229c(e) because it is a limitation on eligibility for voluntary departure for a class of aliens — those who wish to remain *527 in the United States while appealing from the BIA’s decision.
In his dissent, Judge Reinhardt argues that the Attorney General’s regulation is not consistent with § 1229c(e) because the term “eligibility” under § 1229e(e) does not “encompass a condition ... predicated on ... future actions,” such as an alien’s decision to pursue an appeal. Reinhardt Dissent Op. at 539. For the reasons we have explained, we disagree with such a narrow and isolated reading of “eligibility;” [17] but even assuming that his reading is correct, 8 C.F.R. § 1240.26© is still valid. Section 1229c does not specify when the Attorney General must decide eligibility for voluntary departure; it states only that he “may permit” an alien to voluntarily depart after the immigration judge’s grant of voluntary departure. Whenever the Attorney General decides not to permit voluntary departure, and thereby terminates a grant, it is a determination of the alien’s eligibility for voluntary departure at that moment in time. The fact that 8 C.F.R. § 1240.26© automatically terminates voluntary departure when an alien files a petition for review does not change the result — it is still a determination within the Attorney General’s discretion that the alien cannot voluntarily depart. The regulation just announces how the Attorney General will exercise his discretion.
In sum, § 1229c gives the Attorney General discretion (“may permit”) to prohibit and thereby terminate voluntary departure in § 1229c(b)(l) and authority to limit eligibility in § 1229c(e). Section 1229c does not contain any language that qualifies this discretion. Indeed, the rest of § 1229c only lists express limitations on the Attorney General’s authority to grant voluntary departure. See, e.g., 8 U.S.C. § 1229c(a)(2)(A) (imposing a general 120-day maximum on voluntary departure deadlines); id. § 1229c(b)(l) (imposing four limitations on the class of aliens eligible for voluntary departure); id. § 1229c(c) (prohibiting grants of voluntary departure to aliens “previously permitted to so depart after having been found inadmissible under section 1182(a)(6)(A)”). Contrary to Judge Reinhardt’s view, Congress did not mandate that the voluntary departure requirements listed in § 1229e(b)(l) would be exclusive. Reinhardt Dissent Op. at 537, 538-39. Instead, *528 Congress plainly contemplated that the Attorney General might further limit eligibility and prohibit voluntary departure.
We also note that the Attorney General’s regulation, 8 C.F.R. § 1240.26®, does not deprive an alien of his fundamental right to judicial review or penalize the alien for exercising that right. An alien who files a petition for review is free to voluntarily depart within 30 days of filing and pursue the appeal from outside of the United States. See, e.g., Contreras-Bocanegra v. Holder, 678 F.3d 811, 813-14, 819 (10th Cir.2012) (considering an appeal from an alien who was outside of the country); Jicm Le Lin v. U.S. Att’y Gen., 681 F.3d 1236, 1238 (11th Cir.2012) (same); Pruidze v. Holder, 632 F.3d 234, 235 (6th Cir.2011) (same); Marin-Rodriguez v. Holder, 612 F.3d 591, 592 (7th Cir.2010) (same); see also Nken v. Holder, 556 U.S. 418, 424-25, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (explaining that Congress has “lifted the ban on adjudication of a petition for review once an alien has departed”); Dada, 554 U.S. at 22, 128 S.Ct. 2307 (noting that Congress has permitted aliens who have departed the United States to seek judicial review, but not a motion to reopen); Patel v. Att’y Gen. of U.S., 619 F.3d 230, 235 (3d Cir.2010) (“[U]nder 8 C.F.R. § 1240.26®, an alien does not nec essarily lose her right to file a petition for review. If she voluntarily departs within 30 days of filing a petition for review and provides evidence that she remains outside of the United States, she ... can thus pursue her petition for review”). If an alien chooses to remain in the United States to pursue the appeal, the regulation does not penalize the alien for exercising the fundamental right to judicial review; rather, it penalizes the alien for remaining in the United States illegally while the appeal is pending.
The Attorney General’s regulation may alter the alien’s incentives to appeal, but it ultimately balances the interests of the alien and those of the government. Voluntary departure represents a quid pro quo between the alien and the government. Dada v. Mukasey, 554 U.S. 1, 11, 128 S.Ct. 2307, 171 L.Ed.2d 178 (2008). As the Supreme Court explained, “[i]f the alien is permitted to stay in the United States past the departure date to wait out the adjudication of the motion to reopen, he or she cannot then demand the full benefits of voluntary departure; for the benefit to the Government — a prompt and costless departure — would be lost.” Id. at 19-20, 128 S.Ct. 2307. That same benefit is lost to the government if an alien files a petition for review. The Attorney General’s regulation restores the quid pro quo between the government and the alien.
In light of the broad grant of discretion over voluntary departure in both § 1229c(b)(l) and § 1229c(e), we hold that the promulgation of 8 C.F.R. § 1240.26® was a proper exercise of the Attorney General’s authority.
IV. CONCLUSION
We defer to the BIA’s holding that aliens who are inadmissible under INA § 212(a)(9)(C)(i)(I) may not seek adjustment of status under § 245®. Furthermore, we hold that under the five-factor test of Montgomery Ward, this rule can properly be applied to Garfias because he filed his § 245® application before any court ruled he was eligible to do so. Finally, we hold that 8 U.S.C. § 1229c(e) unambiguously provides the Attorney General with the authority to promulgate 8 C.F.R. § 1240.26®, and that Garfias’s grant of voluntary departure terminated upon his decision to file a petition for review.
PETITION DENIED.
*529 Chief Judge KOZINSKI,
disagreeing with everyone:
The law is unsettled in many areas and parties often don’t know the precise rule that applies to their past conduct until their case is decided. Thus, retroactivity issues lurk in many, perhaps all cases, yet we don’t routinely conduct retroactivity analysis. Before we go into retroactivity mode, we must first determine whether this case involves a retroactive application of law. Because it doesn’t, we have no reason to discuss retroactivity.
A law is retroactive when it “attaches new legal consequences to events completed” before it went into effect — a determination guided by considerations of “fair notice, reasonable reliance, and settled expectations.” Vartelas v. Holder, — U.S. -, 132 S.Ct. 1479, 1491, 182 L.Ed.2d 473 (2012) (internal quotation marks omitted). INS v. St Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), illustrates a classic example of a retroactive law. The petitioner there pled guilty “almost certainly” in reliance that doing so would preserve his chance to seek section 212(c) relief — a “waiver of deportation” granted “at the discretion of the Attorney General.” Id. at 293-94, 323, 325, 121 S.Ct. 2271. St. Cyr thus took an action in the real world — giving up his rights to a fair trial, to a jury of his peers, to the presumption of innocence, to proof beyond a reasonable doubt — in exchange for a limited punishment that did not include losing his eligibility for 212(c) relief. Id. at 325, 121 S.Ct. 2271. It was that completed act — the guilty plea — that animated the Court’s conclusion that the statute was impermissibly retroactive. Id.; see also VaHelas, 132 S.Ct. at 1483-84 (holding that an IIRIRA provision was impermissibly retroactive because it “attached a new disability” to Vartelas’s pre-IIRIRA guilty plea and conviction).
Garfias can’t point to any similar action that he is “helpless to undo,” see VaHelas, 132 S.Ct. at 1489 (internal quotation marks omitted), to which today’s holding attaches new legal consequences. Nor can he point to any settled law that today’s holding unsettles by imposing an additional burden on his past conduct. See id. at 1490-92. There are, in fact, three separate reasons why retroactivity analysis has no place in today’s opinion.
1. Garfias has done absolutely nothing in the real world that would trigger a retroactivity analysis, even if there had been settled law he could have counted on. Bui see p. 530 infra (no settled law). Garfias entered and remains in the United States illegally, and that kind of ongoing conduct is certainly not entitled to solicitude under retroactivity analysis. See Fernandez-Vargas v. Gonzales, 548 U.S. 30, 46 & n. 13, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). The only completed act Garfias can point to that might trigger retroactivity concerns is his application for adjustment of status, which required Garfias to bring himself out of the shadows and thereby increased his chances of being deported. But Garfias is not entitled to continue defying this country’s immigration laws by keeping himself hidden from the authorities; he has no “right to continue illegal conduct indefinitely under the terms on which it began.” See id. If filing his application “risked awakening the sleeping bureaucratic giant who might then resolve to initiate deportation proceedings,” that is “a risk [ ]he always faced.” Hernandez de Anderson v. Gonzales, 497 F.3d 927, 946 (9th Cir.2007) (Tallman, J., concurring in part and dissenting in part); cf. Duran Gonzales v. U.S. Dep’t of Homeland Sec., 659 F.3d 930, 940-41 (9th Cir.2011).
I am aware of Ixcot v. Holder, 646 F.3d 1202, 1210-14 (9th Cir.2011), which holds that an illegal alien’s decision to apply for *530 discretionary relief is a sufficient past event to trigger retroactivity analysis. Ix-cot echoes the reasoning of Hernandez de Anderson, where Judge Tallman quite properly dissented. See supra. We should take this opportunity to extirpate the Hemandez-Ixcot heresy, rather than perpetuating it. But cf. maj. op. at 522 (“Nothing in [In re Briones, 24 I. & N. Dec. 355 (BIA 2007),] ‘impair[s] rights a party possessed when he acted, increase^] a party’s liability for past conduct, or imposed new duties with respect to transactions already completed.’ ”) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).
2. There is another, independent reason Garfias’s case doesn’t trigger retroactivity analysis: At the time he applied for adjustment of status, there was no law resolving the statutory ambiguity at issue here in his favor. Briones thus didn’t create a new legal burden that didn’t exist under “[t]he law then in effect.” Landgraf 511 U.S. at 282 n. 35, 114 S.Ct. 1483. Garfias claims that Briones changed the law from our ruling in Acosta v. Gonzales, 439 F.3d 550, 556 (9th Cir.2006), but Acosta was issued four years after he applied to become a permanent resident pursuant to INA section 245(i). See maj. op. at 507-OS. His only guidance when deciding whether to apply was the text of the INA, which included section 212(a)(9)(C) — a provision that seemed on its face to make him inadmissible. See maj. op. at 507-08, 509, 522-23. The “obvious” tension between sections 245(i) and 212(a)(9)(C) meant that Garfias could have had no assurance that any subsequent interpretation of their interplay would be in his favor. Maj. op. at 522-23.
Briones thus doesn’t attach a new legal consequence to Garfias’s decision to apply for adjustment of status. See Vartelas, 132 S.Ct. at 1491; cf. Judulang v. Holder, — U.S. —, 132 S.Ct. 476, 489 n. 12, 181 L.Ed.2d 449 (2011) (rejecting alien’s argument that two BIA decisions were impermissibly retroactive on the grounds that the agency’s “prior practice” in that area of the law was “so unsettled”). He is not situated similarly to the class of individuals who applied for adjustment of status after Acosta and before Briones. Accordingly, we have no occasion to consider the impact of applying Briones to everyone “who sought adjustment of status in reliance on Acosta,” as Judge Paez urges. See Paez dissent at 547-48, 551-52, 552-53. We can make that decision when we get a petitioner who filed for relief after Acosta. See Singh v. Napolitano, 649 F.3d 899, 901 n. 1 (9th Cir.2011) (per curiam).
3. But even if Garfias had applied to adjust his status during the twenty-one month window between Acosta and Briones, his case still wouldn’t merit retro-activity analysis because Briones didn’t change the law; it settled the law. See Nunez-Reyes v. Holder, 646 F.3d 684, 691-92 (9th Cir.2011) (en banc); Montgomery Ward & Co. v. FTC, 691 F.2d 1322, 1333 (9th Cir.1982) (balancing test applies when necessary to protect “a regulated party’s interest in being able to rely on the terms of a rule as it is written ” (emphasis added)). An agency is the “authoritative interpreter” “of an ambiguous statute [it] is charged with administering” so long as its interpretation is “within the limits of reason.” Natl Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 983, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). No one should have been surprised by the interpretation announced in Briones. It was clearly foreshadowed by the BIA’s earlier ruling in In re Torres-Garcia, 23 I. & N. Dec. 866 (BIA 2006), which predated Acosta by a month and held that an alien who was inadmissible under another provision of section 212(a)(9)(C) couldn’t apply for ad *531 justment of status under section 245(i). See generally maj. op. at 509-11. Acosta’ s interpretation of the statutory ambiguity clarified in Briones was provisional, not authoritative, for purposes of retroactivity analysis. See Brand X, 545 U.S. at 982-83, 125 S.Ct. 2688. Authoritative interpreters operate by the Highlander principle: “There can be only one.”
The majority opinion at least recognizes that the BIA is the “authoritative arbiter of the meaning of the ambiguous provisions of the INA at issue here,” but then goes astray in suggesting that our interpretation of the provisions was “authoritative ... at least until” the BIA issued Briones. Maj. op. at 515. Thus, Garfias and the majority contend, the BIA’s interpretation that contradicts our earlier interpretation in Acosta “brought about [a] change in the law.” Maj. op. at 514 n. 7, 516. Bosh. Brand X makes it perfectly clear that “a court’s opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative.” Brand X 545 U.S. at 983, 125 S.Ct. 2688 (emphasis added). Briones didn’t change the law; it set it.
Nor can I agree with the majority’s gratuitous discussion of separation of powers and its conclusion that “we must treat an agency decision that is contrary to a ruling previously set forth by a court of appeals and, as a result of Chevron and Brand X prompts the court of appeals to defer to the agency, as we would if the agency had changed its own rules.” Maj. op. at 515-16. I find this discussion opaque and confusing — and not the least bit helpful.
The Supreme Court has made it clear that, in those areas where agencies have been delegated interpretive responsibility by Congress, they and they alone can speak with the authority as to what the law means. See, e.g., Brand X, 545 U.S. at 982-83, 125 S.Ct. 2688; Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also Peter L. Strauss, “Deference” is Too Confusing— Let’s Call Them “Chevron Space” and “Skidmore Weight,” 112 Colum. L.Rev. 1143, 1145-18 (2012). It’s as if Congress gave these agencies magic fountain pens that they can use to interlinéate the statutory text in order to fill gaps and resolve ambiguities. Our job is to apply the law to individual cases, based on the normal rules of construction, which include the requirement that we follow the authoritative interpretation of an agency. Where the agency has not yet spoken, our ruling is necessarily provisional and subject to correction when the agency chooses to adopt its own interpretation of the statute. See Kathryn A. Watts, Adapting to Administrative Law’s Erie Doctrine, 101 Nw. U.L.Rev. 997,1000-01 (2007).
We do, of course, set the law of the circuit, which is binding on all the courts— until the agency speaks. At that point we, along with every other court, are bound by a reasonable interpretation adopted by the agency. It is sophistry to claim, as the majority does, that this amounts to an agency changing its own rules — as if we were speaking on behalf of the agency when we adopted our earlier interpretation. It’s far simpler and more correct to say that we took an educated guess as to what the statute meant, just as we often guess what state laws mean in the absence of authoritative guidance from the state supreme court. Cf. Brand X, 545 U.S. at 983-84, 125 S.Ct. 2688; United Gas Pipe Line Co. v. Ideal Cement Co., 369 U.S. 134, 135, 82 S.Ct. 676, 7 L.Ed.2d 623 (1962) (per curiam). But when a state supreme court later contradicts us, we surely wouldn’t say that the state court changed its mind. I see no point in adopting this *532 fiction, and cannot join the rest of the panel in overruling our precedents cited on page 516 of the majority opinion.
* * *
The majority claims that I “conflate[] the result of a retroactivity analysis with the process of conducting it.” Maj. op. at 516. But we’ve held that where an agency’s decision “would not have a retroactive effect ..., we need not reach the less stringent standard set forth in Montgomery Ward.” Singh, 649 F.3d at 901 n. 1; see also Judulang, 132 S.Ct. at 489 n. 12. The majority fails to acknowledge that there are cases that don’t require retroactivity analysis because they don’t involve a retroactive application of the law. The majority also doesn’t give us any way to distinguish cases that raise a legitimate retroactivity question from those that do not, or even bother to explain why this case falls into the former category rather than the latter. What are those charged with applying our law to gather from this? That it’s up to every judge and every panel to conduct a retroactivity analysis whenever they feel it in their guts that the law is being applied retroactively?
The majority is also wrong when it suggests that my approach is equivalent to its own. See maj. op. at 516 & n. 9. I’ve advanced three separate reasons why I believe this case doesn’t involve retroactive application of the law, but I don’t need all three to reach that conclusion; any one, standing alone, would be enough. I engage in no balancing and weighing of factors against each other, whereas my colleagues do.
Balancing involves uncertainty because you have to predict how different judges will assess the factors, which is not always an easy task. This case illustrates my point: Having launched themselves into retroactivity mode, six of my colleagues pick one test while three others pick a different test. Compare maj. op. at 528, with Paez dissent at 553, and Gould cone, at 532. One judge believes that either test comes to the same result, see Graber partial cone, at 534, and another agrees with the majority’s conclusion while applying the test favored by the dissent, see Gould cone, at 532 As an en banc court, we have a responsibility to bring clarity to our law. By the time lawyers in this circuit get through reading all of our opinions, they’ll be thoroughly confused.
I concur in Subsection III.B, maj. op. at 514-23, only to the extent that I agree Briones applies to Garfias. I join in the rest of the opinion.

. Section 245 (i) relief is only available to an alien physically present in the United States "who is the beneficiary ... of ... a petition for classification ... filed ... on or before April 30, 2001; or ... an application for a labor certification ... filed pursuant to the regulations of the Secretary of Labor on or before such date.” 8 U.S.C. § 1255(i)(1)(B).

. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), held that courts must defer to a reasonable agency interpretation of an ambiguity in a statute that the agency is charged with administering. Chevron step one asks “whether Congress has directly spoken to the precise question at issue”; step two asks whether the agency’s interpretation is reasonable. Id.

. Because the BIA did not address the issue of whether Garfias applied for adjustment of status before § 245(i)'s expiration date, we will assume without deciding that Garfias is otherwise qualified to apply for adjustment of status under § 245(i).

. Section 212(a)(9)(C)(i)(II) is the companion provision of the subsection at issue in this case, § 212(a)(9)(C)(i)(I). Subsection II makes inadmissible any alien who has been ordered removed and enters or attempts to reenter the United States illegally, and subsection I makes inadmissible any alien who has accrued over a year of unlawful presence in the United States. See 8 U.S.C. § 1182(a)(9)(C)(i). Thus, subsection II presents the same conflict with § 245(i) as does subsection I.

. 8 C.F.R. § 212.2(e) specifies that applicants for adjustment of status "must request permission to reapply for entry in conjunction with [their] application[s] for adjustment of status.” We explained that "8 C.F.R. § 212.2(e) and (i)(2) expressly permit applicants for adjustment of status who have been previously removed or deported to apply for permission to reapply from within this country.” Perez-Gonzalez, 379 F.3d at 793.

. We have jurisdiction under 8 U.S.C. § 1252(a)(5). We review de novo purely legal questions concerning the meaning of the immigration laws. See Altamirano v. Gonzales, 427 F.3d 586, 591 (9th Cir.2005). We defer to the BIA's interpretation and application of immigration laws unless its interpretation is "contrary to the plain and sensible meaning of the law at issue.” Poblete Mendoza v. Holder, 606 F.3d 1137, 1140 (9th Cir.2010).

. We do not mean to say, as Judge Paez argues, that an agency can overrule a judicial decision or that the agency "changed the law of this circuit.” Paez Dissent. Op. at 545. We still retain ultimate authority to determine whether to defer to the agency's interpretation. But when we do defer to an agency's interpretation of the law, it is not clear for purposes of determining which retroactivity analysis applies whether we or the agency effectively brought about the change in the law.

. Our back-and-forth with the BIA may illustrate the wisdom of remanding to the BIA where the BIA has not previously interpreted the statute and where we believe the statute is ambiguous. "Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.” INS v. Orlando Ventura, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam); see Velazquez-Herrera v. Gonzales, 466 F.3d 781 (9th Cir.2006) (per curiam) (remanding to the BIA to fill in a statutory gap). We anticipate that doing so will, in most situations, avoid the Brand X problem posed in this case.

. Chief Judge Kozinski considers both Garfias's reliance interests and whether Briones represents a change in the law or merely settles it, ultimately coming to many of the same conclusions that we do. See Kozinski Concur Op. at 529-30 (concluding that remaining in the United States illegally is not a valid reliance interest because "Garfias is not entitled to continue defying this country's immigration laws”); id. at 529 (concluding that filing an application for adjustment of status did not qualify as a reliance interest because Garfias applied before Acosta was issued); see also id. at 529 ("Garfias can’t point to any ... action ... to which today’s holding attaches new legal consequences. Nor can [Garfias] point to any settled law that today's holding unsettles by imposing an additional burden on his past conduct.”) (internal citations and quotation marks omitted); id. at 530 ("At the time [Garfias] applied for adjustment of status, there was no law resolving the statutory ambiguity at issue here in his favor ... [and] the obvious tension between sections 245 (i) and 212(a)(9) meant that Garfias could have had no assurance that any subsequent interpretation of their interplay would be in his favor.”) (internal quotation marks omitted); id. at 530 ("Briones ... settled the law”).

. Chevron Oil articulated three factors to consider in making this determination: (1) whether the decision "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed”; (2) a weighing of "the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation”; and (3) "the inequity imposed by retroactive application.” 404 U.S. at 106-07, 92 S.Ct. 349 (citation omitted) (internal quotation marks omitted). In practice, we see very little substantive difference between these factors and those of Montgomery Ward. Cf. Dist. Lodge 64, Int’l Ass’n of Machinists & Aerospace Workers v. NLRB, 949 F.2d 441, 447 (D.C.Cir.1991); Dole v. E. Penn Mfg. Co., 894 F.2d 640, 647 (3d Cir. 1990).

. As Judge Gould observes, although the BIA may have announced the rule, it “does not become binding in this circuit until we defer to that interpretation." Gould Concur. Op. at 533.

. Judge Paez argues that because we are an Article III court we must follow Article III principles, which prohibit deciding retroactivity on a case-by-case basis. See Paez Dissent Op. at 544-45, 546-48. As we have explained, and as Montgomery Ward illustrates, Article III principles are not always applicable to agency decisions and different concerns are at stake when we overrule a prior decision based on our duty to defer to a subsequent agency decision.

. We express no opinion whether other applicants may avoid the retroactive effect of Briones.

. Although § 1229c(e) further provides that “[n]o court may review any regulation issued under this subsection,” a separate section in the INA provides that "[njothing ... in any *524 other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.” 8 U.S.C. § 1252(a)(2)(D). Two courts have held that we may review legal and constitutional challenges to the regulation without addressing § 1129c(e). See Hachem v. Holder, 656 F.3d 430, 438 (6th Cir.2011); Patel v. Att’y Gen., 619 F.3d 230, 234 (3d Cir.2010). The government does not argue otherwise.

. Judge Reinhardt claims that voluntary departure under § 1229c(b)(l) "ha[s] not ... been thought to involve the relinquishment of procedural rights. Reinhardt Dissent Op. at 538. But the important question is not whether post-decisional relief has previously "been thought” to involve relinquishment of procedural rights, but whether the statute permits it. We conclude that it does.

. In dissent, Judge Reinhardt characterizes the statute as simply granting "the Attorney General—or, in practical terms, his delegees—discretion to grant or deny voluntary departure at the completion of the immigration proceeding.” Reinhardt Dissent Op. at 541 (emphasis added). Judge Reinhardt treats § 1229c(b)(l) as if it read “the Attorney General shall permit an alien voluntarily to depart ... if the immigration judge enters an *526 order....” Such a reading violates both the rules of grammar and the statutory scheme. Compare 8 U.S.C. § 1158(b)(1) (the Attorney General “may grant asylum” to qualified aliens), with 8 U.S.C. § 1154(b)(1) (the Attorney General “shall, if ... [the alien] is eligible ... approve the petition” for a visa); see Spencer Enteiprises, Inc. v. United States, 345 F.3d 683, 691 (9th Cir.2003) (“[The language of § 1154(b)] is very distinct from the discretionary language in the asylum context [§ 1158(b)(1)], which allows the Attorney General to deny asylum even to those applicants who meet the statutory eligibility requirements.”).

. It is not clear, as Judge Reinhardt argues, that by using the term "eligibility” Congress intended to limit the Attorney General's discretion to an ex ante determination of whether to permit voluntary departure. For example, suppose that the immigration judge makes a determination under § 1229c(b)(1) that an alien may voluntarily depart, based on the required finding that "the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien’s application for voluntary departure.” 8 U.S.C. § 1229c(b)(1)(B). If shortly thereafter the alien commits a crime that clearly disqualifies her as a person of good moral character, the Attorney General may make the determination that the alien is ineligible for voluntary departure, despite the IJ’s previous order.
The process is similar to the "two-step process” for asylum in which "the applicant [must] first ... establish his eligibility for asylum ... and second ... show that he is entitled to asylum as a matter of discretion.” Kalubi v. Ashcroft, 364 F.3d 1134, 1137 (9th Cir.2004); see also Silaya v. Mulcasey, 524 F.3d 1066, 1070 (9th Cir.2008) ("Once eligibility is established, it is within the Attorney General's discretion to grant asylum.”); Zi Zhi Tang v. Gonzales, 489 F.3d 987, 992 (9th Cir.2007) ("Tang has established asylum eligibility. We remand for the Attorney General to exercise discretion in deciding whether to grant asylum.”); Kumar v. Gonzales, 444 F.3d 1043, 1056 (9th Cir.2006) ("[W]e find Raj statutorily eligible for asylum, and we remand for an exercise of discretion on his asylum claim....”); Khup v. Ashcroft, 376 F.3d 898, 905 (9th Cir.2004) ("Khup is eligible for asylum and [we] remand for the Attorney General to make a discretionary decision regarding whether to grant asylum.”).